Phin E. Blue v. State of Nebraska.

Filed February 26, 1910.   No. 16,407.

1. Criminal Law: Instructions: Reasonable Doubt. To instruct a jury upon the trial of a criminal case that "a reasonable doubt is such a doubt as you are able to give a reason for" is erroneous, and under some circumstances might be so prejudicial as to require a reversal of the judgment of conviction.

2. Adultery: Evidence: Corroboration. Without determining whether in all cases in a prosecution for adultery the unsupported evidence of one of the parties will justify the conviction of the other party

when fully and circumstantially contradicted by the defendant and another apparently credible witness, under the circumstances shown in the record in this case, it is *held* that the wholly unsupported evidence of the complaining witness will not justify the conviction of the defendant.

3. ———: ———: ———. A fact or circumstance relied upon to corroborate the testimony of a witness must have evidence to support it other than that of the witness whose testimony it is supposed to corroborate. A witness cannot by his unassisted testimony corroborate his own evidence.

ERROR to the district court for Kearney county: HARRY S. DUNGAN, JUDGE. *Reversed.*

*Adams & Adams,* for plaintiff in error.

*William T. Thompson, Attorney General,* and *George W. Ayres, contra.*

SEDGWICK, J.

The defendant was tried in the district court for Kearney county upon an indictment of the grand jury, under section 208 of the criminal code. The substance of the offense was charged in the indictment in the following words: "From the 15th day of December, A. D. 1907, to the 1st day of September, A. D. 1908, did unlawfully keep one Libbie Peterson, a woman other than his wife, and did wantonly cohabit with the said Libbie Peterson." The jury rendered a verdict against the defendant, who was sentenced accordingly, and he has brought the case here for review. He insists that the evidence is not sufficient to justify his conviction, and that there were several errors upon the trial which call for a reversal of the judgment against him.

1. The first question discussed in the briefs is that the court erred in giving instruction No. 7. In this instruction and instruction No. 6 the court attempted to define at large what is meant by reasonable doubt. It seems to be conceded that instruction No. 6 is substantially a correct definition, but in instruction No. 7 the court told

the jury: "A reasonable doubt is such a doubt as you are able to give a reason for." There is some discussion in the brief as to whether the sixth instruction did remedy the vice, if any, of the seventh, but it seems that there is no real ground for this discussion. The jury is told plainly that they must be able to give a reason for any doubt that they had as to defendant's guilt, or otherwise such doubt would not be reasonable, and the question is whether this is such an error as requires a reversal of the judgment. Several of the former decisions of this court are cited as determining this question, but they do not seem to be precisely in point. In *Cowan v. State,* 22 Neb. 519, the trial court in defining a reasonable doubt told the jury "it is a doubt for having which the jury can give a reason, based upon the testimony", and this instruction was held to be erroneous, calculated to mislead the jury and require a reversal of the judgment. In *Carr v. State,* 23 Neb. 749, an instruction was given in the following language: "It is a doubt having a reason for its basis derived from the testimony, and a doubt for the having of which the jurors can give a reason derived from the testimony." In this latter case the matter is discussed more at large, and the instruction is held to be erroneous and to require a reversal. Several decisions of other courts are cited and quoted from, and among them a decision from the supreme court of Indiana, in which it is said: "It is not the law that in order to justify an acquittal the doubt must arise out of the evidence given, and be such as to cause a prudent man to hesitate. The doubt may arise from the want of evidence." *Brown v. State,* 105 Ind. 385. In the later case of *Childs v. State,* 34 Neb. 236, the instruction complained of told the jury that a reasonable doubt was a doubt "arising out of the evidence", and such a doubt as "you are able to find a reason in the evidence for." The instruction was held erroneous under the authority of the two cases above cited, but without discussion of the reason of the holding.

These cases then all hold that it is erroneous to tell the jury that a reasonable doubt which would require an acquittal must arise from the evidence, but the precise question presented in this case has not heretofore been determined in this court. The question is: Is it prejudicial error requiring a reversal of the judgment to tell the jury that they must be able to give a reason for any doubt which they entertain of defendant's guilt or such doubt will not be a reasonable one? If a juror, who has doubt of the defendant's guilt, is required by his fellow jurors to give a reason for such doubt, he would feel bound by this instruction to do so or to abandon his convictions. A better rule would require reasons for finding the defendant guilty. To whom must the juror stand ready to give his reasons? Is he to be called upon by the court to formulate a substantial reason for voting for acquittal, or will he be required to give his reasons to the public generally, after the trial is over. There can, of course, be no doubt that such an instruction is erroneous, and we think that it would, at least in some cases, be prejudicial to the defendant. Under the evidence in this case there was great danger of prejudice from such an instruction. The expression "reasonable doubt" is difficult of definition. Many attempts at definition have been criticised by the courts in the reported cases. The definition introduced by Judge Gary in the famous anarchists' case has been very generally disapproved, and this court has often condemned it. On the other hand, the language of Mr. Chief Justice Shaw in the famous trial of Professor Webster was quoted with unqualified approval by the present chief justice of this court in the case above cited, *Carr v. State*, 23 Neb. 749. In this connection we quote from an opinion of the supreme court of California: "It will perhaps accomplish no useful purpose to suggest generally to *nisi prius* judges that, in giving their instructions to juries in criminal cases, they should restrict themselves, upon the doctrine of reasonable doubt, to the use, literally, of the language employed

by Chief Justice Shaw in his great exposition of that doctrine in the *Webster* case, *supra,* and to not undertake to amplify the subject in language of their own. We say that it will perhaps be useless to thus caution trial judges, because the supreme court has so often, in the plainest kind of language, warned such judges of the danger of going beyond the language used in the *Webster* case in explanation of this doctrine, that it would seem that such warnings would be constantly in the minds of those presiding over the trials of criminal cases, so that they would content themselves with the clear and simple language of Chief Justice Shaw, however strong the temptation may be to make the experiment of determining how far they can wade out into deep water without disappearing beneath the surfce. The 'reasonable doubt', as defined by Chief Justice Shaw, is good enough for all the courts of last resort of the country, and, it would seem, ought to be good enough for those judges the records of whose cases must finally be reviewed with a view of determining whether an accused has been tried according to the established forms of law." *People. v. Del Cerro,* 9 Cal. App. 764, 100 Pac. 887.

The courts of the various states do not appear to be in entire harmony upon the question presented by this instruction. The instruction is generally criticised, but some of the courts have refused to regard the instruction as so prejudicial as to necessarily require a reversal. The supreme court of Minnesota had under consideration a similar instruction in *State v. Sauer,* 38 Minn. 438. The instruction contains these words: "This does not mean beyond any doubt, but beyond a doubt *for which you can give a reason."* The court said that this definition "is not without some authority to support it", and citing *Commonwealth v. Harman,* 4 Pa. St. 269, and after remarking, "we are not prepared to say that it contains any error prejudicial," the court proceeded to criticise the instruction quite severely. In *Commonwealth v. Har-*

*man, supra,* the instruction is reported as given upon the trial. It is not the opinion of a reviewing court. It contains many things not in harmony with the practice under our criminal code. It does not contain the language here complained of. We would not have considered it as authority for allowing an instruction such as that now under consideration if it had not apparently been so regarded by the Minnesota court.

The supreme court of Iowa, having under consideration an instruction which contains these words, "a reasonable doubt is such a doubt as the jury are able to give a reason for," held that the instruction was erroneous and prejudicial, requiring reversal. *State v. Cohen,* 108 Ia. 208. The opinion is by Judge Ladd, who gives convincing reasons for his conclusions, and cites several authorities, among them our own cases, above cited.

Other courts have held that to instruct the jurors that they must be able to give a reason for their doubts as to the defendant's guilt is erroneous and so prejudicial as of itself to require a reversal. *Siberry v. State,* 133 Ind. 677; *Abbott v. Territory,* 20 Okla. 119. We have noticed no decisions in which such an instruction is approved, but there are very many in which it is severely criticised, although not held to be so prejudicial as under all circumstances to require a reversal. *Morgan v. State,* 48 Ohio St. 371; *State v. Morey,* 25 Or. 241; *People v. Del Cerro,* 9 Cal. App. 764, 100 Pac. 887; *Wallace v. State,* 41 Fla. 547, 26 So. 715. In *State v. Morey, supra,* the court reviewed the authorities somewhat at length, and among them referred to our own decisions. The discussion is an interesting one.

2. The princple ground upon which the defendant asks for a reversal is that the evidence is insufficient to support the conviction. There is no direct testimony tending to support the verdict other than the evidence of the complaining witness. Her own evidence shows her to be both incompetent and reckless. She could not state her birthday, and, when asked what was her father's name,

she answered: "I call him George." The most important parts of her testimony are composed of monosyllables given in answer to leading questions, and in much of her testimony she is shown to have contradicted herself, and to a large extent while she was under oath in other proceedings. The story that she tells is an unreasonable one and an unnatural one. The evidence is not of such a nature as to make it desirable to quote it at large, and we do not feel that there is any necessity for so doing. That the complaining witness resided with the defendant and his wife for several weeks is conceded. Mr. and Mrs. Blue had been married for about nine years. They had no children, and were living upon a farm, although not engaged in farming. Mr. Blue and his cousin were occupied in corn-shelling, and their business took them to different parts of the county, so that Mr. Blue was frequently away from home, and Mrs. Blue objected to remaining alone during his absence. She was told by a neighbor that she could get the complaining witness to stay with her, and she went for that purpose to the home of the complaining witness, some six or seven miles distant, and took her home with her. Without stating the repulsive details of complainant's story of what took place while she was living with these parties, it is sufficient to say that Mrs. Blue was, by the complainant's own evidence, in a position to observe any improper conduct between these parties, and, if guilt there was, Mrs. Blue was equally guilty with the other parties. Both Mr. and Mrs. Blue were upon the witness stand, and were fully examined and thoroughly cross-examined. Their testimony is reasonable and consistent, and fully and emphatically contradicts the testimony of complaining witness in regard to all matters tending to show the guilt of the defendant. When the complaining witness appeared to be indisposed, Mrs. Blue took her to a physician. He prescribed some medicine, and told Mrs. Blue that if the patient was not improved in ten days to return. She did so, and this physician then told her to go

to another physician, Dr. Smith. Thereupon, Mr. and Mrs. Blue took the complaining witness to Dr. Smith, and upon examination in the presence of Mrs. Blue, Dr. Smith first informed them of the patient's condition. Dr. Smith was upon the witness stand, and his testimony is straightforward and candid, and in no way tends to throw any suspicion upon Mr. Blue. The doctor testified that the complaining witness then stated to him that her father was the cause of her trouble, and that he advised Mr. Blue "to take her home and take care of her or to take her somewhere else." Mr. Blue, who was not present at the examination, asked the doctor afterwards what the girl said, and, when the doctor told him what she had said as to who was the cause of her trouble, Mr. Blue said that it was all right. On his cross-examination, the doctor said that it seemed to him that he stated to Mr. Blue something about taking the girl and taking care of her "and sending her to some home." If the doctor believed her statements as to her father's conduct toward her, he did not, of course, advise sending her to her father, and it seems reasonable, as Mr. and Mrs. Blue testified, that it was upon his advice that the girl was taken to a home in Omaha, where she was cared for. The fact that Mr. Blue believed and approved of the statement that the girl's father was the cause of her trouble and the fact that he immediately after the interview with the doctor took the girl to the Omaha home are relied upon as tending to show guilty knowledge on the part of Mr. Blue, but these facts appear to be equally consistent with innocence upon his part. Under the circumstances disclosed in this record, the conviction could not be sustained, based as it was upon the testimony of complaining witness, unless that testimony was substantially corroborated by some well-established fact. We find nothing in the record that tends to corroborate her testimony.

3. The court instructed the jury: "If you find from the evidence that Phin E. Blue gave or caused to be given to Libbie Peterson turpentine with the purpose of pro-

ducing an abortion, such conduct on his part would be corroborative of the testimony of the prosecutrix, Libbie Peterson, as to the sexual intercourse between them." The complaining witness testified that Mr. and Mrs. Blue gave her turpentine and sugar to drink, and caused her to take it as a medicine. Both Mr. and Mrs. Blue unequivocally deny this, and the circumstances that are conceded or proved tend rather to corroborate Mr. and Mrs. Blue than the complaining witness. After Mrs. Blue had first taken her to a physician, she was given such medicine as the physician had prescribed, and the testimony of the complaining witness herself indicates that this was the medicine that she now characterizes as turpentine and sugar. Moreover, the complaining witness testified that Mr. Blue told her the name of the party, a near neighbor, from whom he obtained the turpentine. Mr. Blue denies this, and the neighbor was not produced as a witness to corroborate the complainant's testimony. It is manifestly erroneous and prejudicial to single out a circumstance testified to by the complainant alone and inform the jury that they might believe the complainant upon that point, and, if so, consider it as corroborating her evidence in general. The witness could not corroborate herself in such manner.

For these reasons, the judgment of the district court cannot be sustained, and the cause is reversed and remanded.

REVERSED.

REESE, C. J., not sitting.

LETTON, J.

I concur in the reversal for the reason that I believe the ninth instruction as to procuring an abortion is not based upon any evidence in the case, and was prejudicially erroneous, and I also agree with the opinion in regard to instruction No. 7.

I cannot agree with that part of the opinion which discusses the evidence. I believe that, while the evidence

is not very strong, it is sufficient to uphold a verdict, if believed by the jury.

ROOT, J., I concur in the above.

ROSE, J., dissenting.

My view of the evidence is radically different from that expressed in the opinion of the majority. The complain· ing witness testified in direct and positive language that defendant committed the offense with which he is charged. Some of the facts are not open to controversy. Defendant was a married man. The complaining witness was unmarried and was under 18 years of age. She had been debauched. She gave birth to a child September 19, 1908. Most of the time from December 22, 1907, until the child was born, she lived in defendant's home. There was opportunity for commission of the offense. In addition to these facts, she gave nauseating. details which prove defendant's guilt, unless she testified falsely. Whether she told the truth or not was a question for the jury. I dissent from the conclusion that her story is either untrue or unbelievable in the face of the verdict of the jury.

I am also pronounced in my conviction that the corroboration of her testimony by that of other witnesses is sufficient, if any is required. By the testimony of either defendant or his wife, or both, these facts appear in the record: Complaining witness went into defendant's home December 22, 1907, as a companion for his wife, without stipulated compensation, and had only one dress at the time. A few days after Christmas he gave the girl a ring, and in April following defendant's wife gave her a dress, which was described as a "Christmas present." During the time she lived at defendant's home she received clothing worth $8 or $10. These facts are shown independently of the testimony of complaining witness.

A practicing physician at Shelton testified that defendant and his wife brought the girl to his office April 23, 1908, that he examined her, and told them she had

been pregnant four or five months. In testifying the physician also said that, when defendant went out of the office, he said: "They were trying to lay it onto him." The import of this expression is that defendant in some way previously knew the girl's condition, or had been or was about to be accused of responsibility therefor. He nevertheless took her to his home and kept her there, where she was no longer needed as his wife's companion; his father and mother in the meantime having joined defendant's family. This proof does not rest on the testimony of the complaining witness. Defendant admitted on cross-examination that the complaining witness from April 24, 1908, until August 30, 1908, slept in the same room where he and his wife slept, though in a separate bed. During that time at least her condition was known to defendant. This is not her proof. By defendant's own testimony it is shown that he went to Omaha August 30, 1908, with no companion, except the complaining witness, took her car-riding there, kept her over night in a hotel, though in a room separate from that occupied by him, and the next day took her to the Salvation Army Rescue and Maternity Home, where he arranged for her accouchement, left her there, and returned to see her the following day. The matron of the home was sworn as a witness, and said defendant paid the girl's lying-in expenses to the extent of $25. She also stated: "I asked him if he would be willing to take the child, and he said that it would be quite a burden on him, but, if necessary, he supposed that he could do it *and would do it.*"

There is proof tending to show that defendant prior to that time had part in procuring from the complaining witness a statement showing that the paternity of the unborn child was traceable to the girl's father. The matron testified defendant said he would take the child, if necessary. What necessity would induce him to accept in advance the burden of keeping a child of incestuous coition and shocking depravity? I am unwilling to say that the matron testified falsely, or that her statement

had no proper, evidential bearing on the truth of complainant's testimony that defendant was guilty of the offense with which he was charged. For anything appearing in the record, the matron, when she gave her testimony, may have been influenced alone by a desire to tell the truth. This part of the story was not told by the complaining witness. To my mind the finding that there is nothing in the record that tends to corroborate her testimony disregards both the record and the rules of evidence. If corroboration is necessary, and if the circumstances narrated do not corroborate the direct evidence of defendant's guilt, it may as well be understood that punishment for adultery is practically at an end. Offenders of this kind do not invite neighbors to be witnesses of their unlawful conduct or commit the offenses in the presence of others.

According to my understanding of the proofs and the law, there is abundant corroboration of the testimony of the complaining witness, without reference to the turpentine episode. In this view of the record, the instruction that the giving of the turpentine was corroborating testimony was not a prejudicial error, I solemnly protest against the condemnation of the state's evidence, and dissent from the conclusion of my associates.