Bartels v. State.

## WILLIAM BARTELS V. STATE OF NEBRASKA.

FILED MAY 29, 1912.   No. 17,375.

1. **Criminal Law:** STATUTE: CONSTITUTIONALITY. The act of 1907, laws 1907, ch. 167 (criminal code, sec. 117c), defining poultry stealing and providing a penalty therefor, does not violate that part of section 11, art. III of the constitution, which provides: "No bill shall contain more than one subject, and the same shall be clearly expressed in its title."

2. ———: INSTRUCTIONS: REASONABLE DOUBT. An instruction in a criminal prosecution that the rule that requires proof of guilt beyond a reasonable doubt "is not intended to aid any one who is in fact guilty to escape," and which intimates that an acquittal must be justified and a verdict of not guilty must be "authorized," is erroneous. In the condition of this record, it is found to be prejudicially erroneous.

3. **Larceny:** EVIDENCE. The evidence is discussed in the opinion, and is found insufficient to support a conviction.

4. ———: POULTRY STEALING: PENALTY. Under the act of 1907, defining and providing a penalty for poultry stealing, if the value of the property stolen is less than $35, the penalty as for a felony should not be inflicted, except in cases of habitual crime, or when the act is accompanied with circumstances of aggravation.

ERROR to the district court for Dakota county: GUY T. GRAVES, JUDGE. *Reversed.*

*D. H. Sullivan* and *R. E. Evans,* for plaintiff in error.

*Grant G. Martin, Attorney General,* and *Frank E. Edgerton, contra.*

SEDGWICK, J.

The defendant (plaintiff in error here) was convicted

in the district court for Dakota county under chapter 167, laws 1907 (criminal code, sec. 117c). The section is as follows: "If any person shall steal any chickens, ducks, turkeys, geese, pigeons, or guineas of any value or, if any person shall receive or buy any chickens, ducks, turkeys, geese, pigeons or guineas, that shall have been stolen, knowing the same to have been stolen, with intent, by such receiving or buying, to defraud the owner; or, if any person shall conceal a poultry or pigeon thief, knowing him to be such; or, if any person shall conceal any chickens, ducks, turkeys, geese, pigeons or guineas, knowing the same to have been stolen; every such person so offending shall be imprisoned in the county jail not less than ten days nor more than six months or in the state penitentiary for not more than three years nor less than one year, in the discretion of the court."

1. It is contended that the act violates section 11, art. III of the constitution: "No bill shall contain more than one subject, and the same shall be clearly expressed in its title." It is said that, "if it is permitted to stand, it amends section 119 of the criminal code, and makes no reference to section 119, nor does it pretend to repeal that section." A similar act is considered and upheld in the recent case of *Wallace v. State, ante,* p. 158. That was a prosecution for hog stealing under section 117b of the code. Former decisions of this court are referred to, and the discussion and conclusion are entirely applicable to the question here presented.

2. It is also contended that the act is unconstitutional because more than one subject is contained in the title and in the act. The title of the act is: "An act to provide a penalty for stealing live poultry or pigeons, for receiving buying or concealing live poultry or pigeons, knowing the same to have been stolen, and for concealing poultry or pigeon thieves." The point insisted upon appears to be that poultry and pigeons are two different subjects of legislation and cannot be legislated upon in the same act. Poultry, according to the definition in

Webster's New International Dictionary is: "(2) Domestic fowls reared for the table, or for their eggs or feathers, such as cocks and hens, capons, turkeys, ducks and geese." Pigeons, if "reared for the table," are within the definition. The fact that pigeons are poultry and might have been considered as included in that term will not affect the question. If the title of the act had specifically named other poultry, as turkeys and geese, it would probably not be contended that for that reason the act is unconstitutional.

3. It is objected that the evidence is not sufficient to support the verdict. The witness Frank Phillips testified that in January of last year he was employed by the defendant as a farm hand, and that on the evening of about the 25th of January the defendant requested the witness and one Chester Ream to go with him to the place of one Bridenbaugh and steal his chickens; that they went accordingly, and defendant took some sacks from his granary to carry them in, and they made three several trips, each time filling three several sacks, stealing in all 56 chickens; that they took the chickens to the defendant's place and put them in an ice house that night, where they remained until the following night, when the witness and the defendant went to the ice house and cut off the tails of the roosters and placed them in the chicken house with the chickens of the defendant; and the following morning the little boy, about eight years old, opened the chicken house door and allowed the chickens to escape; that the defendant then put up a few feet of wire netting to keep the chickens from returning to their former owner. The defendant is a well-to-do farmer, with 280 acres of land where he has lived from 15 to 20 years, and has a family consisting of his wife and, at that time, two children, and they had at that time quite a number of chickens of their own, at least several hundred. It was no theory of the prosecution that the defendant stole these chickens because of gain or because of any use he had for them, but the witness testified that the defendant had

shortly before that time bought some straw of Mr. Bri-
denbaugh and had failed to get the straw he had paid for,
and he became very angry with Mr. Bridenbaugh and
proposed to steal these chickens to "get even with him."

There is no evidence corroborating this testimony of
the witness Phillips, unless the following circumstances
should be thought to support his testimony: Mr. Briden-
baugh testified that a day or two after the chickens were
taken he was at the defendant's place and saw a large
number of chickens, two or three hundred, and among
them he saw two or three that had their tails cut off. He
testified that he thought he saw some of his chickens there,
but he did not pretend to identify them; and, being asked,
"And you take one of your roosters and put him up be-
sides Mr. Bartels' rooster and there was no difference in
their tails, you couldn't hardly tell which chickens were
yours or Mr. Bartels'? A. All were Plymouth Rock
chickens. Q. All alike exactly?" He did not answer this
question. Some time after the chickens were missed by
their owner, a young man who resided in that neighbor-
hood was riding by the defendant's place, and he testified
that he noticed the defendant's chickens as he went by,
and he was asked this question: "You may state whether
you noticed any bob-tailed roosters there." He did not
answer the question directly, but his answer would indi-
cate that he intended to testify that he did. On cross-
examination he was asked: "You couldn't tell whether
cut with pair of sheep shears, or razor, or whether pulled
out? A. No; so many there. I noticed they were bob-
tailed." Another witness who passed the place some five
or six months later gave similar testimony.

If the theory of the prosecution was that the defendant
attempted to remove any of the distinguishing character-
istics so that the stolen chickens could not be identified,
this testimony would of course amount to nothing. It
was shown without dispute that the defendant had upon
his premises very many chickens that would have fully
answered the description that these witnesses gave of

those they observed.   The evidence of the witness Phillips
then is wholly uncorroborated, and his testimony was con-
tradicted by the defendant, the defendant's wife, and the
witness Chester Ream, the defendant's brother-in-law, all
of whom testified emphatically to circumstances and con-
ditions which, if true, render it impossible that the de-
fendant could have taken the chickens, as alleged by this
witness.

This witness quarreled with defendant's wife about
three months after the chickens were missed and was dis-
charged by defendant.   The defendant and his wife both
testify that when discharged he was very angry and made
threats that he would get even with defendant.   The wit-
ness admits the quarrel and discharge, but denies the
threats, and testifies that he immediately declared the de-
fendant had stolen the Bridenbaugh chickens, and began
this prosecution against the defendant.   The defendant,
his wife and brother-in-law all testify that on the evening
of the 26th of January Phillips borrowed defendant's
horse, representing that he wanted to visit his sister some
few miles distant; that he was gone nearly the whole night,
returning about 3 o'clock the following morning.   The
defendant testifies that when he went to the stable about
7 o'clock in the morning Phillips was cleaning the horse,
removing harness marks which showed plainly that the
horse had been driven hard in harness.   This, Phillips
denies, but he did not visit his sister, and is not corrobo-
rated in his explanation of his whereabouts during the
night.   Six or seven, apparently respectable, men, mer-
chants and other business men, without any apparent in-
terest in the controversy, testified that they had known
the witness Frank Phillips for many years, knew thor-
oughly his reputation for truth and veracity in the com-
munity where he lived, and that it was bad.   This evidence
was not contradicted, except that one witness testified
that some people said his reputation for truth and veracity
was good and some said it was bad.   Also an attempt was
made, which was at least partially successful, to impeach

the defendant, but there was no attempt to impeach the defendant's wife, nor the witness Chester Ream. If the testimony of a witness can be discredited by impeachment, it would seem that the witness Phillips was effectually discredited.

The court instructed the jury: "The jury are instructed that one of the modes recognized by law for impeaching the veracity of a witness is the introduction of persons as witnesses who testify that they are acquainted with the general reputation for truth and veracity of the person sought to be impeached in the neighborhood in which he resides; and, if the jury believes from the evidence in this case that the general reputation of the witnesses Frank Phillips and William Bartels for truth and veracity in the neighborhood where they reside is bad, then the jury have a right to disregard the whole of their testimony and to treat it as untrue, except where it is corroborated by other credible evidence or by facts and circumstances proved on the trial." If the jury had observed this instruction, they must have considered the evidence of the witness Phillips, wholly uncorroborated and discredited by impeachment as it was, insufficient to establish the guilt of the defendant beyond a reasonable doubt.

It seems probable that the jury were misled by the following instruction given by the court: "The rule which clothes every one accused of crime with the presumption of innocence, and imposes upon the state the burden of establishing his guilt beyond a reasonable doubt, is not intended to aid any one who is in fact guilty to escape, but is a humane provision of the law intended, so far as human agencies can, to guard against the danger of an innocent person being unjustly punished. A doubt, to justify an acquittal, must be reasonable, and it must arise from a candid and impartial investigation of all the evidence in the case; and unless it is such that, were the same kind of a doubt interposed in the graver transactions of life, it would cause a reasonable and prudent man

to hesitate and pause, it is insufficient to authorize a verdict of not guilty. If, after considering all the evidence, you can say you have an abiding conviction of the truth of the charge, you are satisfied beyond a reasonable doubt." This was the only instruction in which an attempt was made to define "reasonable doubt," except that in another instruction it is said: "The state must establish every material allegation in the information beyond a reasonable doubt, that is, to a moral certainty." If we consider that the witness Phillips was by his own testimony an accomplice in guilt, and that his evidence is wholly uncorroborated, it would seem probable that the jury by the eleventh instruction above quoted were led to believe that there must be some special circumstances in the case "to justify an acquittal" and "authorize a verdict of not guilty."

4. The defendant was sentenced to imprisonment in the penitentiary for a period of not less than one year nor more than three years, and it is urged that the sentence is excessive. The statute leaves a large latitude to the discretion of the court in fixing the penalty from ten days in the county jail to three years in the penitentiary. The statute is a new one, and it seems that the legislature considered that there might be circumstances under which the extreme penalty should be inflicted. If a defendant has prepared himself for the business of poultry stealing and practices it persistently for gain, it calls for more serious consideration than does a first offense done in anger and as a means of retaliation for a real or supposed injury. When the value of the property taken is less than $35, imprisonment in the penitentiary should be inflicted only in cases of habitual crime, or accompanied with violence or breaking or other circumstances of aggravation. The punishment in this case seems excessive. If the defendant should be found guilty, his offense would be regarded rather as a misdemeanor than a felony. Because of this insufficiency of the evidence and the erroneous definition of "reasonable doubt," it seems clear that the de-

fendant has not had such a trial as the law awards to all persons accused of crime.

The judgment of the district court is reversed and the cause remanded.

REVERSED.

LETTON and ROSE, JJ., dissent.