FULLER SHELLENBERGER V. STATE OF· NEBRASKA.

FILED JANUARY 2, 1915.   No. 18,636.

1. **Criminal Law:** EVIDENCE: CONFESSIONS. The accused, while in a precarious condition from being overheated, was cared for by the sheriff at Burlington, Kansas. Upon his making inquiry as to the relatives of the accused so that they might be notified in order to care for him Shellenberger requested that the officers at Nebraska City be informed, giving as a reason that he had been implicated in a murder near that place. The sheriff wrote to Nebraska City, but the officers referred to took no action. Upon being so informed, accused requested that the sheriff of Nemaha county, Nebraska, be notified, and told that he had been implicated in a murder committed in that county some 13 or 14 years before. He gave the details of the murder at length, which he repeated to the sheriff of Nemaha county when he arrived. *Held*, That the confession being voluntarily made before arrest, and before any accusation had been made, was properly received in evidence.

2. ———: ———: ———. The father of the accused was for years afflicted with Saint Vitus dance. His mother was a woman of violent temper and an epileptic. In his boyhood the accused was also afflicted with Saint Vitus dance. He is below the average in intelligence. The evidence, unaided by the confession, is not sufficient to sustain a conviction. Under these circumstances, every fact tending to throw any light upon the truth or falsity of the confession should be submitted to the jury, and since mental

tendencies, peculiarities and predispositions may extend over a lifetime, the fact that he had made a false confession in 1890 that he was guilty of another murder was not too remote to be admissible in evidence.

3. ——: REVERSAL: EXCLUSION OF EVIDENCE.  A double murder was committed near the city of Omaha in 1890.  The guilty person was apprehended, tried, convicted, and executed.  Soon after the murder, defendant was arrested, charged with complicity in that crime, to which he made a confession.  It was afterward shown that the confession was untrue, and the prosecution was dismissed. At this trial, in order to aid the jury to determine the weight to be given to the confession made by accused as to the murder of Bahuaud and to show the abnormal condition of the defendant's mind, it was sought to prove that he had made such previous false confession.  This evidence was excluded upon objection by the state.  *Held,* That this ruling was prejudicially erroneous.

4. ——: CAUTIONARY INSTRUCTION: POLICE OFFICERS.  A cautionary instruction as to the evidence of police officers is only proper to be given when the officer is a witness for the state in the endeavor to convict the accused.

5. ——: EVIDENCE: OPINIONS.  A nonexpert witness may, after detailing the facts and circumstances upon which he bases his opinion, give his opinion upon the question of sanity, but he is not permitted to express his opinion without disclosing the facts upon which it is based.

6. ——: IRRELEVANT EVIDENCE.  Error cannot be predicated upon the admission of testimony which at the time seems relevant. If by reason of further facts it appears to be irrelevant and prejudicial, defendant should move to strike it from the consideration of the jury, otherwise he cannot complain.

7. ——: INSTRUCTIONS: CONFESSION.  An instruction, which stated in direct terms that "the confession of defendant, if he made such confession, is competent evidence to prove his connection with such crime," without further instruction sufficiently qualifying the direct statement under the facts in this case, should not have been given.

8. ——: ——: REASONABLE DOUBT.  Instructions given upon the subject of reasonable doubt criticized.

ERROR to the district court for Nemaha county: JOHN B. RAPER, JUDGE.  *Reversed.*

*John C. Watson* and *Max M. Cohn,* for plaintiff in error.

*Grant G. Martin, Attorney General, Frank E. Edgerton*
and *Fred G. Hawxby, contra.*

LETTON, J.

Plaintiff in error, hereinafter termed the defendant, was
indicted on November 14, 1913, upon the charge that up-
on the 16th day of June, 1899, he murdered one Julian
Bahuaud, in the attempt to perpetrate a robbery, by strik-
ing him on the head with a blunt instrument. He pleaded
not guilty, was tried, and was convicted of murder in the
first degree. The jury fixed the penalty at imprisonment
for life, to which term he was sentenced. He brings the
case here by proceedings in error.

The proof that a murder was committed is positive and
undisputed. Bahuaud was an old man, something of a re-
cluse, who lived alone on a farm a short distance from the
village of Julian. On the afternoon of Sunday, June 18,
1899, some neighbors found his body lying on the bed in
his house. Decomposition had set in, and it was appar-
ent that he had been dead from 24 to 48 hours, according
to the medical testimony. His skull was crushed, appar-
ently by a blow from some blunt instrument. His house
had been ransacked, drawers were opened, and a tin box,
which apparently had contained papers, was found up-
stairs with the lid cut open. A print of bloody fingers was
on the stairway wall. A chair was displaced and a bench
overturned in the kitchen. Some empty dishes and a can-
dle were standing on the table. An inquest was held at
once. No clue to the perpetrators of the crime was found.

On June 28, 1913, Sheriff Grubb of Coffey county, Kan-
sas, was called into the country near-by by a telephone
message that there was a sick man on the public highway.
He went out, and found the defendant lying by the road-
side overcome by heat. He took him to Burlington, put
him in the jail, and called the county physician. The
doctor examined him, and told the sheriff that he was suf-
fering from heat, had a fever, and that he could not tell
what might happen. The sheriff told the defendant that
the doctor said he was in a bad condition, and, if he had

any people, probably he had better communicate with them so that they could come and get him, or take care of him. Defendant told the sheriff to notify the officers at Nebraska City to come and get him; that he was implicated in a murder which took place there in a big cut near the wagon bridge down by the river. The officers at Nebraska City were notified, but none came. The sheriff testified that, when the officers did not come from Nebraska City, defendant told him about the murder of Julian Bahuaud. He said that he and two other men met in the back part of a barber shop in Julian; that they afterwards met at a street corner and walked upon the railroad to Bahuaud's home; that as they went up they looked in at the window and saw the old man eating his supper, his back towards the door; it was about dusk; that one of them hit him on the head with a stone tied in a handkerchief; that it was not their intention to kill him, but to commit a robbery; that after they found he was dead they carried him and laid him on the bed. He said that he went outside to watch, and the others went upstairs and found a tin box in which they found some money; that they went back up the railroad to town, and he went back to where he was working in the country. The witness asked him about the blood on the wall of the stairway, and he said one of them cut his hand in opening the tin box, and coming down stairs left blood on the wall or the banister.

W. H. Jones, sheriff of Nemaha county, Nebraska, testified that he went to Burlington, saw the defendant in jail at that place, and had three conversations with him. The statements made by defendant, in substance, were the same as those made to Sheriff Grubb, but, in addition, defendant said that it was about eight or half past in the evening, and that the lamp was lighted; that Gibbs slipped in and hit Bahuaud; that the others got about $800 or $1,000 from the tin box, and that he got $200 in money. In the third talk he added that he was working at the time for Henry Levigne, and that he stopped work about the middle of the afternoon that day and went to Julian. After repeated questioning, he finally told him that one

of the men was Frank Gibbs, and that the other was a little fellow called Joe, but he could not remember his last name. On the witness asking if it was Joe Kopf, he said, "Yes, it was." He also told that he remained in the neighborhood of Julian for about a year, when one Sunday he heard a Mr. Cook say, "Let's hang Shellenberger for killing old man Julian;" that he then thought they knew about it, and went away. He afterwards said to the witness he did not see Gibbs strike the deceased. The witness said that he suggested the name of Joe Kopf to defendant because a number of people were suspicious that he was one of the parties who committed the murder.

Mr. Levigne testified that defendant worked for him in June, 1899, and, by referring to his account book, that on the 16th of June he worked three-quarters of the day, being off duty the latter part of the day, and that he did not see him again until next morning. On cross-examination he testified that he did not remember whether defendant was at home for supper that evening, he could not be positive. He also said it was not unusual for defendant to take a half or three-quarters of a day off, and go to town, and that defendant continued to work for him until the 4th of August.

The witness Cook testified to making a joking remark about a year after the event, proposing to hang Shellenberger for Bahuaud's murder. He described the surroundings of the house, and said that the window in Bahuaud's kitchen was a half window, and so high that a man could not look into it from the ground outside, the top of it going close to the ceiling. The house stood about two feet above the ground, and, while one could see out from the inside, he could not see in from the outside. The state also showed by this witness that defendant, a year or two before the murder, worked on an adjoining farm to that of deceased, and lived one winter in a cabin about 30 rods from Bahuaud's house. The foregoing is a much condensed statement of the essential facts proved by the state.

For the defense, one group of witnesses was called to prove that defendant was weak-minded, or defective men-

tally, and that he had a mania or predisposition to make false confessions that he was implicated in serious crimes. Another group, among whom was Kopf himself, was called to prove an alibi for Kopf. Defendant also took the stand. He admitted that he made nearly all the statements testified to by Jones and Grubb, but declared them to be false, and said he could not tell why he made them. He also testified that he remained in the neighborhood of Julian and Nebraska City for four or five years after the remark made by Cook, to which allusion had been made, which he said was made in a joking manner, and to which he paid no attention. A doctor testified that with other physicians he made a physical examination of defendant, and found scars caused by syphilitic lesions, and that syphilis is apt to affect the mental soundness of those afflicted with it, and cause degeneracy, loss of mind or mental capacity.

In rebuttal, two other physicians were called who had participated in the examination of defendant. These testified they found no evidence of syphilis, and that defendant was not weak-minded, but was mentally dull. Several witnesses testified that soon after the murder Kopf's hand was wrapped up.

Over 100 assignments of error are made in the petition in error. We cannot consider them all with due regard to the rights of other litigants.

It is strenuously insisted that the confessions made to Sheriff Grubb and Sheriff Jones were not voluntarily made, and are for that reason inadmissible. At the time these were made defendant was suffering from a heat stroke, and had been taken to the county jail, not because he was accused of any crime, but in order to give him proper care. The statements made by him to Sheriff Grubb, both as to a murder at Nebraska City and the Bahuaud murder, seem to have been entirely voluntary on his part. He was apparently unrestrained except by his own physical condition. No compulsion is shown as to the statement to Sheriff Jones. We have no doubt that the statements made were proper to be received in evidence in connection with all the testimony as to the circumstances under which they

were made, and it was for the jury, and not for the court, to say what, if any, weight should be given to them.

Error is assigned upon the exclusion of the testimony of several witnesses as to a confession made by defendant, years before, that he was guilty of another murder.

The testimony of T. J. Mahoney, of Omaha, was taken out of the hearing of the jury in order to accommodate the witness, and it was afterwards offered on the part of defendant as a deposition by consent of counsel. The gist of Mr. Mahoney's testimony was that in 1890 a Mr. and Mrs. Jones were murdered in Douglas county; that at that time Mr. Mahoney was prosecuting attorney for that county; that one Neal was arrested and charged with the crime; that Neal made a statement which implicated the defendant; that defendant was arrested and taken to Douglas county, and, while in custody, confessed that he went with Neal to the farm where Mr. and Mrs. Jones lived to steal horses and cattle; that he saw Neal shoot them, and that Neal gave him the revolver, which he threw into a stream near-by. Mr. Mahoney then questioned him as to the locality of the crime and the situation of the buildings upon the farm. He did not reply, and seemed unable to do so, but when leading questions which suggested answers were put he brightened up and answered, "Yes;" that most of these questions suggested things contrary to the fact, but that defendant readily answered "Yes" to any of them. A complaint and information was filed against him by the witness, but upon further investigation the prosecution was dropped and Shellenberger discharged. Questions as to the defendant's mental condition at that time were excluded upon objections by the state. Nearly all of this testimony was excluded as too remote and immaterial, and was not read to the jury.

The testimony of H. P. Hayes was taken in the same manner, and much of it excluded as too remote. He testified that he was chief detective of the Omaha police force at the time of the Jones murder; that after Shellenberger was arrested for that crime he talked with him several times with regard to it; that Shellenberger stated, in sub-

stance that he was associated with Neal in the murder, giving details; that upon inquiry it was found that he could not describe anything about the farm, which led to an investigation at Nebraska City, and that following this investigation the defendant was discharged.

George W. Leidigh testified that he had lived in the state of Nebraska for 43 years, had been warden of the state penitentiary, and had been a member of the legislature for several terms; that in February, 1890, defendant worked for him at Nebraska City for a week or ten days putting up ice, and including the 4th of February, which was the date of the Jones murder. He produced a check dated the 4th of February, and stated that he delivered that check to Shellenberger between the hours of 8 and 10 o'clock at night on that day; that he always paid his men in the evening after they were through work; that in the course of business this check was returned to him, and that he afterwards took it to Omaha and delivered it to Mr. Mahoney, who afterwards returned it to him. Both Hayes and this witness positively identified the defendant as being the Joseph Shellenberger who was charged with the Jones murder and who made the confession. The witness was then asked with respect to conversations which he had with defendant at that time, with reference to the confession and other talks and acts of defendant with the object of laying a foundation for his opinion as to sanity. This was objected to and excluded, and an offer to prove denied.

Mr. Chapman, who served as mayor of Nebraska City, and who had lived in Nebraska City for 30 years, testified that the defendant was commonly known by the name of Joe Shellenberger; that his parents lived upon a small farm which the witness owned, and that he was on quite intimate terms with the defendant and his family; that defendant's mother was a woman of high temper, would have tantrums, would go about the house talking to herself, and at times would fight with any member of the family; that she suffered from epileptic fits, would fall down and froth at the mouth; that defendant's father was

afflicted with Saint Vitus dance for many years and finally died from that affliction; that the defendant, when he was a boy on the farm, was afflicted with Saint Vitus dance and was a very nervous boy.

It was also shown that the defendant is without education, unable to read or write, and below the average in intelligence; he had been a wanderer from place to place both before and after 1899, changing his name from time to time, sometimes working as a farm hand or laborer, sometimes apparently engaged in petty crimes. With such testimony in relation to defendant's character and life, and under the peculiar conditions of this case, where the truth of the confession is the most material matter in the controversy, it seems to us essential to a fair trial that every fact which would throw any light upon its truth or falsity should be submitted to the jury. The state insists that the testimony with reference to defendant's confession or implication in the murder of Mr. and Mrs. Jones is too remote in point of time to be of any weight; but it must be remembered that the subject of investigation is the mental condition and peculiarities of defendant, that the motive for the confession is material, and that a peculiar mental bias, weakness or tendency may extend for a lifetime. There is often a persistency in both mental and physical habits that is remarkable, and a defective mind may continue as it was in childhood.

The defendant stood charged with a crime punishable by the extreme penalty of the law. If he is a degenerate or defective, there is the more reason for care and caution that every provision which the law offers for the protection of those accused of crime should be allowed. There are numerous cases upon record where men have voluntarily confessed themselves to be guilty of atrocious crimes, where investigation has proved their innocence, and the confession could only be attributed to a defective or abnormal mentality. This is said, not as indicating or expressing any opinion as to the guilt or innocence of the defendant, but merely to emphasize the necessity of extreme care to allow the accused a full opportunity to make his defense.

Shellenberger v. State.

After a careful consideration of all the testimony in the record, we are satisfied that without the confession there is not sufficient evidence to sustain the conviction. The most important inquiry therefore—the vital question in the case—is what weight and value should be given to the confession as evidence. To determine this, all the testimony bearing upon defendant's physical and mental condition, both at the time of the confession and before, the tendencies which he may have inherited, his manner of life, and the fact that he ·confessed to other homicides ·of which he could not have been guilty, should all be taken into consideration. We are of opinion that evidence as to any fact occurring during the life of this defendant which is in any way calculated to throw light upon the credibilty of his confession is material to the issues, should have been submitted to the jury, and that it was prejudicial to his rights to exclude it.

The court gave the following instruction: "A certain police officer has testified in this case, and you are instructed that under the laws of this state, in weighing his testimony, a greater care should be used, because of the natural and unavoidable tendency of such persons in procuring and stating evidence against the accused." The witness Hayes is the only police officer who was sworn. His testimony was for defendant. Instructions of this nature are countenanced by the courts in behalf of a defendant, in order to call attention of the jury to the fact that the hunting instinct still exists, and that men whose duty it is to prosecute criminals sometimes allow their zeal, perhaps unconsciously, to color or bias their testimony in the endeavor to procure conviction. This is the only reason why such instructions are permitted. If this instruction had any effect, it could only be to disparage the testimony of Hayes.

It is said that the court erred in refusing to permit the defendant to show, by several witnesses called by him, that, in the opinion of each of them, the defendant was insane on the subject of confessions implicating himself in crimes. We think that in the main the court was justi-

fied in excluding this evidence. The settled rule is that a nonexpert may, after detailing to the jury at length the facts and circumstances upon which he bases his opinion, give his opinion upon the question of sanity. Not being an expert, after he has given the facts upon which he bases his opinion, the jury are as well fitted to decide the question as the witness, and he is, therefore, not permitted to express his opinion without disclosing the facts upon which he bases it. This rule of the law of evidence is so elementary as to require no authorities to support it.

Complaint is made with respect to the admission of the testimony of Cook as to the remark that was made by him to Shellenberger which has been alluded to. Since the defendant told this to the sheriff at Burlington, it was proper to allow the witness Cook to testify to it also, as corroboration of the confession and as showing a motive for flight. Its effect as evidence, however, practically disappeared when it was shown that, though Cook had not seen the defendant afterwards until the trial, Shellenberger remained in the vicinity for at least four or five years afterwards. If it was desired to exclude the testimony, defendant should have moved the court to remove its consideration from the jury, since it was only proper to receive it to show a motive for flight on account of fear that his guilt was suspected, and in connection with evidence that he actually fled or went in hiding.

Error is assigned on account of instruction No. 20, which is as follows: "The court instructs the jury that if the prosecution in this case has proved, independent of the confession of the defendant, beyond a reasonable doubt that Julian Bahuaud was killed on the 16th day of June, 1899, as alleged in the indictment in this case, then the confession of the defendant if he made such confession, is competent evidence to prove his connection with said crime, and may, with slight corroboration, be sufficient to convict." The complaint is that there was no proof outside of the confession to show defendant's connection with the crime, and that it was erroneous to say "that the confession of the defendant, if he made such confession, is

competent evidence to prove his connection with said crime." We think there was no error in the preliminary statement as to the fact of the murder, but we agree with the defendant that the latter part of the instruction, which tells the jury that "the confession, of the defendant, if he made such confession, is competent evidence to prove his conection with said crime," is too broad a statement. It is true the confession *may* be competent evidence, but this can only be so if the jury are satisfied that the defendant made it voluntarily and understandingly, and not by reason of mental weakness or obliquity. In other words, the instruction seems to determine as a matter of law that the confession "is competent evidence," while it was for the jury to determine its competency and weight as evidence.

Complaint is made as to the giving of instructions Nos. 12 and 13, defining reasonable doubt. In *Blue v. State*, 86 Neb. 189, in the opinion by Sedgwick, J., some of the language of this instruction is considered at some length and condemned. It is then suggested that the instruction upon reasonable doubt given by Chief Justice Shaw in the trial of Professor Webster for the murder of Parkman (*Commonwealth v. Webster*, 5 Cush. (Mass.) 295, 320), which was expressly approved in this state in *Carr v. State*, 23 Neb. 749, is a model which may well be followed by our trial courts. It was said in *Flege v. State*, 90 Neb. 390, 401, by a minority of the court, and in *Bartels v. State*, 91 Neb. 575, by a divided court, that an instruction similar to No. 12 was erroneous, and was prejudicially erroneous in those cases.

The case is a difficult one. On the one hand, the story told by Shellenberger seems to be corroborated by the physical facts surrounding the tragedy; on the other hand, an abnormal and defective individual, with a vivid imagination uncontrolled by sound reason, living at the time in the neighborhood of the crime, at the house of a man who had attended the inquest, where all the circumstances and details were matters of common discussion and general knowledge, might, years afterwards, relate

these incidents and by an exaggerated egoism, if his mental peculiarities ran in that direction, accuse himself of the crime. Such instances have not been uncommon in the history of criminal law in England and in this country. Even in this state in recent years, unfounded confessions of murder have been made, and the confessing party acquitted when all the facts were disclosed. The defendant may be guilty, but the orderly and impartial administration of justice and the dignity and welfare of the commonwealth demand he be afforded the opportunity to produce before the jury all of the material and competent evidence upon which he relies.

The judgment of the district court is

REVERSED.

ROSE, J., not sitting.

FAWCETT, J. I concur in the views of the majority as general legal propositions, but under the evidence in the record, taken as a whole, I do not think they justify a reversal.