WILHELM FLEGE V. STATE OF NEBRASKA.

FILED NOVEMBER 28, 1911. No. 17,136.

1. **Evidence: SUFFICIENCY.** Some of the evidence in the case is referred to in the opinion in the discussion of the errors complained of, but the objection that the evidence is not sufficient to support the verdict is not determined, it appearing that another trial will be necessary.

2. **Criminal Law: INSTRUCTIONS: APPLICABILITY.** The instructions of the court should be applicable to the precise question being tried. If an instruction is given defining what may generally be considered as a sufficient motive for crime, its application to the case in hand should be explained.

3. ——: ——: **ASSUMPTION OF FACTS.** In a prosecution for murder, when it is proved without doubt that a homicide was committed by pistol-shot wounds, an instruction which refers to the cause of the death of the deceased as "the pistol-shot wounds inflicted by the defendant" is incorrect, as assuming that the defendant inflicted the wounds.

4. ——: ——: **MALICE: QUESTION FOR JURY.** In a prosecution for murder, when the circumstances of the killing are all established by the evidence, it is erroneous to instruct the jury that the law implies malice from such circumstances. It is for the jury to determine whether the act was purposely and maliciously done.

5. ——: ——: ——: **APPLICABILITY.** In such case, if the homicide was committed by shooting, there being no attempt to justify the shooting, but the question is whether the defendant committed the act, such an instruction as to the circumstances under which the law will imply malice has no application and may be misleading.

6. ——: ——: **REASONABLE DOUBT.** Instructions attempting to define "reasonable doubt," *held* erroneous and prejudicial.

7. ——: ——: **ALIBI: APPLICABILITY.** In a prosecution for murder, when the precise time that the murder was committed is in

dispute, but there is no question as to the whereabouts of the defendant at any time, it is erroneous to instruct the jury that the defendant relies upon proof of alibi.

8. ——: ——: QUESTIONS FOR COURT AND JURY: WITNESSES: CREDIBILITY. If a witness upon a former hearing has testified to a different state of facts than those testified to by him at the trial, it is erroneous to instruct the jury that, if they are satisfied that such statements were made "through an honest fear of personal violence, such statements would not be the voluntary act of the witness and would not operate as impeaching statements." It is for the jury to determine whether the witness was actuated solely by an honest fear of personal violence, and whether there was sufficient apparent cause for such fear, and how much reliance could be placed upon his evidence in view of such contradictory statements.

9. ——: ——: DEGREES OF HOMICIDE. In a prosecution for murder in the first degree, it is not reversible error to define the different grades of homicide, including murder in the first degree, although that charge is afterwards withdrawn from the consideration of the jury and the cause submitted upon the charges of murder in the second degree and manslaughter only.

10. ——: ——: GOOD CHARACTER: QUESTION FOR JURY. A request for instruction that evidence of good character "may be relied upon to raise a doubt of his guilt sufficient to acquit him" is properly denied. It is true that good character counts for much in a prosecution for murder, but whether it should be relied upon in a given case to turn the scale in favor of defendant is a question for the jury.

11. ——: PRESUMPTION OF INNOCENCE. In a criminal prosecution, the presumption of innocence continues in favor of defendant through the trial until overcome by evidence establishing guilt beyond a reasonable doubt.

12. Erroneous rulings of the court in excluding evidence are stated and considered in the opinion.

ERROR to the district court for Dixon county: GUY T. GRAVES, JUDGE, *Reversed.*

*J. J. McCarthy, Frank A. Berry* and *Frederick S. Berry,* for plaintiff in error.

*Grant G. Martin, Attorney General, Frank E. Edgerton* and *C. A. Kingsbury, contra.*

SEDGWICK, J.

On the 30th day of June, 1910, Louise Flege was shot and killed at her home in Dixon county. She was then residing with, and keeping house for, her brother, the defendant, and he was afterwards charged with her murder. Upon trial in the district court for Dixon county he was found guilty of murder in the second degree, and has brought the record of the proceedings here for review by petition in error.

1. He insists that the evidence is not sufficient to justify his conviction. One Eichtenkamp, a young man of about 18 years of age, was working for the defendant, and had been living with the defendant and his sister for a little more than two months. He had been there for a short time in the preceding year. He continued to stay there for about three weeks after the murder, and about that time he told the officers that the defendant had committed the crime. He was the principal witness for the prosecution, and his testimony is substantially all of the evidence that there is in the record tending to prove the guilt of the defendant. Immediately after the murder this young man told a very different story. His evidence was taken under oath at the coroner's inquest, and he there testified to circumstances which, if true, would prove conclusively that the defendant is not guilty of the crime with which he is charged. He testified upon the trial that he was plowing corn on the defendant's farm during the forenoon of the day of the murder, and that the defendant was painting his automobile house, and that they both went to the house for dinner at about half past 11 o'clock. The deceased had prepared the meal, and they all sat down to dinner about 12 o'clock. After they had eaten their dinner, which he thought took about 20 or 30 minutes' time, he and the defendant smoked, and then took a nap, the defendant lying upon the couch and the witness lying upon the porch, near the front door.

While they were sleeping, which he thinks might have been 20 or 30 minutes, the defendant was awakened by his sister, and was told that the defendant's brother wanted to talk with the defendant at the telephone. It appears from the uncontradicted evidence that the defendant and his brother, Fred Flege, who lived on an adjoining farm, had contemplated going to town with the defendant's automobile, and that Fred at this time called for the defendant to ask him to go then. The deceased went to the telephone, and told Fred that the defendant was asleep, and was by him told to awaken the defendant and have him come to the telephone. This she did, and the defendant and Fred then completed their arrangements to go immediately to town. This young man further testified that, when the deceased awakened the defendant, he was awakened also, and that they immediately went out to the automobile. The defendant drove the machine up toward the house, and went into the house to make some preparations for his trip, telling the witness to put some water in the automobile. The witness put some water in the automobile, and then went to the barn, where his team was, intending to go to the field to plow corn. In his testimony at the coroner's inquest he testified that he went and got a milk pail with which to put the water in the automobile. This would have made it necessary for him to go to the house, as the milk pails were kept in the kitchen. If he had gone to the house, he would have undoubtedly known more about what took place there than he afterwards testified that he knew. In his testimony at the trial he said that he used the slop pail that was standing at the well to put the water in the automobile, and did not go to the house. According to his further testimony at the trial, while he was putting the water in the automobile, he heard some talk in the house between the defendant and the deceased. He could not understand anything that was being said, but testified that they were quarreling, and just as he got

to the barn he heard the defendant and his sister coming out of the house. The defendant was assaulting her at that time; she was walking backwards to get away from him, and the witness said he heard the deceased say: "Leave me alone, leave me alone. What did I do to you?" The witness went to them, and asked the defendant what he was going to do, and the defendant told him: "That is none of your business. You hurry up and get out of here." The witness then went back to the barn, and just as he arrived there he heard a shot and saw the deceased on her knees, the defendant before her, or a little to one side, with a revolver in his hand pointed at her. The witness then went on preparing his team to go to work and heard another shot. The deceased was then lying on the ground in the yard, and the witness saw the defendant leave her and drive away with his automobile. As the defendant passed the witness, he threatened the witness, and told him to keep still about it, and then drove on. It appears from the uncontradicted evidence that the defendant went immediately to the home of his brother Fred, arriving there soon after 1 o'clock, and that the two men went to town with the automobile, as they had arranged to do, and returned to Fred's place at about 4 o'clock in the afternoon. The defendant was a young man about 29 years of age. When he left his brother's place, he stopped at a neighbor's, and talked with the girls there. He took one of the girls, with whom he seems to have been somewhat interested, for a ride, and then arranged with them to wash his machine, which they had done on former occasions. He stayed there some little time, and then stopped in the field where some of his neighbors were at work, and invited the young men to spend the evening with him at his brother Fred's. He did not arrive home until about 6:30 o'clock. This witness testifies that immediately after the defendant left home that afternoon the witness went into the field to work. He saw the deceased lying in the yard. Hogs were

running loose in an adjoining yard, and the gate between the two yards was left open. At the preliminary examination he testified that he did not shut the gate to keep the hogs out from the deceased because he was afraid of the defendant. On the trial of the case he testified that the gate was broken and he couldn't shut it, and that when he came home the gate was still open, but the dog was in the gate keeping the hogs from going through. He further testified that soon after he went into the field he saw an acquaintance, and they had some conversation, in which it appears that the acquaintance asked him some questions about the deceased, and whether the witness liked her, etc. He testified that he told the acquaintance that he saw the deceased on the porch after the defendant went away, and that she was all right. The witness' home, where his father and mother and their younger children resided, was about two miles from the defendant's home. The witness testified that he was at home several times with his father's family after the murder, and they talked about the murder, but the witness never told them what he had seen, but told them circumstances tending to show that some one other than himself or the defendant was guilty of the crime. When the witness went home from his work in the evening of the murder, he saw the body of the deceased still lying in the yard, and went into the house to the telephone to call the defendant at his brother Fred's. The defendant was not there, but he (the witness) informed Fred that the deceased was lying in the yard, and asked him to come over, which Fred immediately did. Fred brought a neighbor with him, and soon after they arrived the defendant also arrived.

It was at first supposed that a tramp that had been seen in the neighborhood had committed the crime. The defendant and his brother employed a detective, and the defendant took the detective from place to place, as the detective dictated, searching for evidence as to who had committed the crime. After this had gone on for about

three weeks, and the sheriff and others interested in the matter were unable to find any satisfactory evidence as to who was the guilty party, the sheriff saw this witness, and told him that other officers were coming out there, and that something had to be done. The witness was then given to understand that the officers and others interested had reached the conclusion that either this witness or the defendant had committed the crime. The witness then for the first time declared that the defendant was guilty.

The evidence covers about 2,000 pages of the record. We have not attempted to state all of the circumstances tending to indicate who was the guilty party. An outline of the principal facts appears to be necessary to an understanding of the questions presented. The defendant had lived at this place since his infancy. Many respectable witnesses testified to his good character and correct life. There was an attempt made by the prosecution to show a motive for the crime of which the defendant was charged. A neighbor testified to a trifling conversation that took place some time before. The time and circumstances were not stated, and afterwards this evidence was stricken from the record. The evidence, then, in this record which is supposed to show a motive for this crime comes wholly from the witness Eichtenkamp. He testified that the deceased objected to the defendant using his automobile so much as he did. The evidence upon that point is very meager, and relates principally to the time when the defendant went into the house on the day of this murder to prepare for his trip with his brother. The witness did not hear the conversation, but he appears to have inferred that they were quarreling about the defendant's leaving his work to go to town with his automobile. The witness also testified to a former occasion when the deceased told the defendant that the house was on fire, and they went out and found that the chimney was burning out, and the defendant, he says, made some severe remarks about

the women folks burning up houses.  This, it is thought, tends to show that the defendant and the deceased did not live peaceably together.  The defendant's two brothers and his sister and others testify that the relations between the defendant and the deceased were always pleasant, and that there was never any difficulty between them.  If there was any motive for the defendant to commit this crime, it was anger caused by the remarks of his sister during the few minutes that the defendant was in the house immediately before the crime was committed.  Unless the defendant or the witness Eichtenkamp committed this crime, there seems to be no explanation in the evidence as to how it occurred. Unfortunately it sometimes appears that, when a terrible crime like this is committed, it is impossible, for a time at least, to ascertain with any degree of certainty who is the guilty party.  Under such circumstances all good citizens are aroused and inspired with a determination to punish the murderer.  Their righteous zeal and earnestness may mislead them and divert their attention from the real criminal.  The problem presented was whether this defendant, or the witness Eichtenkamp, or some unknown parties, committed the crime.  It appears to have been difficult of solution.  It must finally be resolved by a jury under the careful instructions of the court, using all of the safeguards furnished by the rules of law in such cases to guard against a wrongful conviction.  Many things that took place during the course of this trial are complained of by the defendant.  Some of the objections are quite technical and relate to matters apparently not prejudicial to the defendant, but some of them are substantial and require us to reverse the judgment.

2.  After discussing the sufficiency of the evidence to support the verdict and judgment, the brief of the defendant calls attention to the instruction of the court as to the motive for the crime.  That instruction was in the following words: "By motive is meant the force

behind the will which prompts the act. It may be love of gain, lust, selfish desire, hatred, sudden heat of passion, or any of the various causes which move the will power." There was no evidence in the record of the existence of any of these recited motives, unless it should be thought that the evidence tended to show "sudden heat of passion." The instruction that we are considering correctly states an abstract proposition of law, and would not be prejudicial if given in connection with other instructions which pointed out its applicaton to the case.

3. The twenty-seventh instruction given by the court to the jury was as follows: "If, however, the jury should find from the evidence beyond a reasonable doubt, first, that Louise Flege is dead, and that she died in the county of Dixon, state of Nebraska, on the 30th day of June, 1910; second, that said Louise Flege died from the effects of the pistol-shot wounds inflicted upon her by the defendant in the manner and by the means specified in the information; third, that the defendant without legal excuse and maliciously inflicted said wounds upon the said Louise Flege with the purpose and intent thereby to kill her, but without premeditation and deliberation; fourth, that said wounds were inflicted by the defendant upon the said Louise Flege in the county of Dixon, and state of Nebraska, on the 30th day of June, 1910, or at some time prior to her death, then it is your duty to find the defendant guilty of murder in the second degree." We think under the circumstances in this case this instruction, when considered with the whole charge to the jury, might have been misleading. There was but one question to be tried in this case. There was no doubt about the murder. The deceased was killed by two pistol-shot wounds, one entering the breast and another through the brain. The only question was whether the defendant fired those shots. There was no doubt that Louise Flege died from the effects of these shots. The second paragraph of the instruction

submits the question whether the deceased "died from the effects of the pistol-shot wounds inflicted upon her by the defendant." There was danger from this wording of the instruction that the jury would understand that the court considered and assumed that the wounds were inflicted by the defendant.

4. The fourteenth instruction given to the jury was as follows: "The jury are instructed that the law presumes that a person intends all the natural, probable and usual consequences of his act; that when one person assaults another violently with a dangerous and deadly weapon, likely to kill, not in self-defense or in defense of habitation or property, and not in a sudden heat of passion or sudden quarrel, and the life of the party thus assaulted is actually destroyed in consequence of such assault, then the legal and natural presumption is that death or great bodily injury was intended, and in such case the law implies malice and such killing would be murder." This instruction was erroneous and prejudicial in this case. There was no room for any implication of law as to malice. Such an instruction is sometimes proper, as when the killing by the person charged is admitted, and the question is as to whether it was intentionally or purposely done. If the fact of the killing is established and the circumstances surrounding the killing are not fully shown, so that the jury can judge from the circumstances whether it was intentional, the law will imply legal malice; but, where the circumstances of the killing are all established by evidence or are manifest and not controverted, the law raises no implication as to malice, but leaves that as a fact to be determined by the jury from all of the circumstances surrounding the killing. In this case the question was whether the defendant did the shooting. If he did, he was guilty. In such case an instruction of this kind is misleading and erroneous. It has been several times decided by this court that the giving of this instruction when not applicable to the facts in the case is such an

error as to require a reversal. *Vollmer v. State,* 24 **Neb.** 838; *Lucas v. State,* 78 Neb. 454; *Kennison v. State,* 80 Neb. 688.

5. Instructions 24 and 25 are as follows: "(24) The rule which clothes every one accused of crime with the presumption of innocence, and imposes upon the state the burden of establishing his guilt beyond a reasonable doubt, is not intended to aid any one, who is, in fact, guilty, to escape, but is a humane provision of the law intended, so far as human agencies can, to guard against the danger of an innocent person being unjustly punished. A doubt, to justify an acquittal, must be reasonable, and it must arise from a candid and impartial investigation of all the evidence in the case; and, unless it is such that were the same kind of a doubt interposed in the graver transactions of life it would cause a reasonable and prudent man to hesitate and pause, it is insufficient to authorize a verdict of not guilty. If after considering. all the evidence you can say you have an abiding conviction of the truth of the charge, you are satisfied beyond a reasonable doubt."

"(25) The court instructs the jury, as a matter of law, that the doubt which a juror is allowed to retain in his mind, and under which he should frame his verdict of not guilty, must always be a reasonable one. A doubt produced by undue sensibility in the mind of a juror, in view of the consequences of his verdict, is not a reasonable doubt, and a juror is not allowed to create sources of doubt by resorting to trivial and fanciful suppositions and remote conjectures as to possible state of fact differing from that established by the evidence. You are not at liberty to disbelieve as jurors, if, from the evidence, you believe as men. Your oath imposes upon you no obligation to doubt where no doubt would exist if no such oath had been administered. You are instructed that, if after a careful, impartial consideration of all the evidence in the case, you can say and feel that you have an abiding conviction of the guilt of the

Flege v. State.

defendant and are fully satisfied to a moral certainty of the truth of the charge made against him, then you are satisfied beyond a reasonable doubt."

Instruction No. 25 was prejudicially erroneous in this case. This court has had occasion more than once to criticise this instruction, and under some circumstances has held it to be so prejudicial as to require a reversal. *Brown v. State*, 88 Neb. 411. In *Blue v. State*, 86 Neb. 189, this court quoted from a decision of the supreme court of California, severely criticising some of the trial courts of that state who persisted in giving this instruction which has many times been declared erroneous, and in some cases is so prejudicial as to require a reversal.

The writer considers instruction No. 24 as also erroneous and prejudicial, especially in connection with No. 25. A jury in such a case ought not to be told that they must "justify an acquittal," or that they must find something in the case "to authorize a verdict of not guilty." It is not necessary, however, to repeat the views expressed in *Blue v. State, supra,* and in the opinion of the supreme court of California, therein referred to. The majority of this court, however, considers that instruction No. 24 is not prejudicially erroneous in this case.

6. The court instructed the jury that there was evidence tending to show an alibi, and describing the nature and effect of such evidence. It is objected that there was no evidence upon which to predicate such an instruction, and we think that the objection is well taken. The dispute was as to whether the defendant committed this act, and incidentally as to the time when the act was committed, but there was no dispute in the evidence as to the location of the defendant. It is plainly shown when he left his home and when he returned. There was no attempt to maintain that he was at any time in any different place than as alleged by the state. The instruction therefore has no application to the facts in the case. The danger is that by the

giving of such instructions the attention of the jury will be diverted from the real issue, and that they may be led to suppose that in some respects at least the defense is fictitious.

7. The court instructed the jury that if they were satisfied from the evidence that a witness had made conflicting statements under oath, or otherwise, "through an honest fear of personal violence, such statements would not be the voluntary act of the witness and would not operate as impeaching statements." If the witness was actuated solely by an honest fear of personal violence when there was sufficient apparent cause for such fear, his statements under such circumstances might not be voluntary. The language of the instruction as given is not accurate and might have been misleading.

8. It is complained that the court stated in its instructions the elements of the crime of murder in the first degree, and then withdrew that charge from the consideration of the jury, and submitted only the charges of murder in the second degree and of manslaughter. We do not find that there was any error of the court in this instruction. Each of the three several degrees of homicide was correctly defined by the court, and then the jury were told that there was not sufficient evidence to convict of murder in the first degree. We do not see that the defendant could have been prejudiced, by this action on the part of the court.

9. The coroner was a witness for the defense, and was asked this question: "Now, Doctor, assuming that Louise Flege was shot in the breast first, assuming that Louise Flege was on her knees after the first shot, would it have been possible for her to have fallen in the position in which you found her after receiving the second shot?" The question was objected to, and the court remarked: "It looks to me like a pretty thin slice of expert there, but you may answer." The witness said: "It would have been impossible." The evidence showed without contradiction that the shot in the breast passed through

the body in a downward course, and that the second shot
entered just back of the ear and passed directly through
the brain. It would have been competent to show by
the expert what the immediate effect of these wounds
would be, and allow the jury to determine from all of
the evidence whether it was possible that, the murder
being committed as the witness Eichtenkamp testified,
the deceased could have fallen in the position in which
she was found. It may be considered that the objection
might have been sustained on account of the form of the
question, still, the witness being allowed to answer, the
remark of the court might be prejudicial to the defendant
as tending to lessen the force of this evidence which under
the circumstances in the case appears to have been quite
important.

10. After the court, on its own motion, had instructed
the jury in regard to the evidence of the previous good
character of the defendant, the defendant requested the
following instruction, which was not embraced in that
given by the court: "You are instructed that the
accused has called witnesses to prove his good character
and that he is a peaceable and law-abiding citizen; the
same is before you pertinent and proper. And the
evidence that the prisoner possessed a good character for
being a peaceable and law-abiding citizen may be relied
on to raise a doubt of his guilt sufficient to acquit him,
which, without such proof, would not have existed. And
if, after you have carefully examined the evidence in this
case, you shall be able to reconcile it with the innocence
of the prisoner, it will be your duty to acquit him." It
would have been improper for the court to tell the jury
that evidence of good character "may be relied on to
raise a doubt of his guilt sufficient to acquit him," and
this instruction was properly refused. It is true that
good character counts for much in a prosecution of this
kind, and a defendant may often very safely rely upon
his good character to obtain an acquittal, but whether it
should be relied upon by the jury in a particular case

as sufficient to acquit him is wholly a question for the jury, and not for the court.

11. The defendant requested the following instruction: "You are instructed that the presumption of innocence continues with the accused until his guilt is established by the evidence beyond a reasonable doubt." It is usual to embrace the idea of this request in instructions as to the presumption of innocence, and it is ordinarily better to do so. The instruction as given by the court has been frequently given, and has not ordinarily been considered as of itself sufficient ground for reversal. It is not clear that the defendant was prejudiced in this case by the omission complained of.

12. Many rulings of the court in the admission and exclusion of evidence are complained of. The witness Eichtenkamp was cross-examined by different attorneys for the defendant, and much of the ground was gone over with more than once and many immaterial and unnecessary questions were asked the witness. This fact may have led to the exclusion of some of the evidence that ought to have been admitted.

The witness Eichtenkamp, as we have seen, testified at the coroner's inquest, and his evidence there was wholly inconsistent with his evidence given upon the trial. He attempted to explain this fact by stating that, when he testified at the inquest, he was actuated wholly by fear of the defendant. Upon his cross-examination he was asked: "You were around to parties and beer drinks with your friends yourself, and never told any of them, did you?" The question was objected to as improper cross-examination, and immaterial, and assuming a state of facts not in the evidence. The objection was sustained and the evidence excluded. The evidence seems to be material and proper in cross-examination, and ought not to have been excluded for the reason given in the objection. Other similar questions were also erroneously excluded. Also the witness was not allowed to answer whether he had during the intermission of

the court been talking with a detective who was interested in the prosecution, and whether the detective was not then talking to him in regard to the evidence in the case.

There was some evidence tending to show that, after the defendant left home on the afternoon of the murder, the deceased had been working in the garden, and had there been criminally assaulted by some person, and afterwards murdered, and that the deceased was accustomed to taking care of and working in the garden. The defendant produced a witness who testified that some hoeing had recently been done in the garden, and the defendant offered to prove that early the next morning the weeds and grass that had been hoed in the garden indicated that the work had been done during the afternoon previous. This evidence ought to have been received, but it was excluded by the court. The weather was warm and the sun was bright on the afternoon of the murder, and the evidence strongly indicates, if it does not show, that if this work was done during that afternoon it must have been done by the deceased, and that none of the work was done in the garden during the forenoon of that day.

The witness Eichtenkamp was asked if he was "pretty badly scared" by the defendant, and whether he could run faster than the defendant, and whether he could have run down to one of the neighbors and told them about the murder; whether he said anything about the murder until after he knew that he himself was suspected; whether he knew that he himself was suspected at the time he told the sheriff about it; how badly the gate between the hog lot and the yard where the deceased lay was broken; how long it would have taken him to repair the gate; whether he made certain statements at the preliminary examination as to the condition of the gate, and why he did not close it; whether, when the witness was with his family immediately after the murder, anything was said about the murder; whether

he talked with his father about the case immediately after the murder; whether the defendant and the deceased "got along pretty well as brother and sister," and whether their relations were pleasant and agreeable so far as he knew, and other questions of like character; whether the deceased made outcries when she was assaulted by the defendant, and whether she knew that the witness was in the yard at the time or not. These questions were excluded upon objection of prosecution, and the witness was not allowed to answer. Possibly some of these questions had already been sufficiently answered, and the court excluded them for that reason. Some of them had not been answered by the witness. They were material and proper in cross-examination, and should have been allowed. The cross-examination at some points was too much restricted, and in some respects too much latitude was allowed.

Other matters are discussed in the briefs, but it is not thought that their discussion would be of assistance in another trial, and we do not consider it necessary to further extend this opinion, already, perhaps, too long.

For the reasons stated, the judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.