## WILHELM FLEGE V. STATE OF NEBRASKA.

FILED JUNE 18, 1915. No. 18468.

1. **Criminal Law:** REVIEW: SUFFICIENCY OF EVIDENCE. It is the settled rule in this court that when a case has been tried two or more times, the verdict each time being in favor of the same party, this court will not set aside the last verdict as being against the weight of the evidence, unless the evidence is clearly insufficient to sustain it. *Dunbar v. Briggs*, 18 Neb. 94; *Missouri P. R. Co. v. Fox*, 60 Neb. 531, 557; *Souchek v. Karr*, 83 Neb. 649.

2. ——: ——: ——. And this rule is not confined in its operation to civil cases, but is equally applicable in a criminal prosecution.

3. ——: ——: ERRORS. And in such a case a third conviction for the same offense will not be set aside for errors occurring at the trial, unless it clearly appears in the record that such errors deprived the accused of a fair trial and were the probable cause of his conviction.

4. ——: MANSLAUGHTER: SUFFICIENCY OF EVIDENCE. The evidence set out in this opinion and in our two former opinions, 90 Neb. 390, and 93 Neb. 610, *held* to be of such a character as to forbid a holding by the appellate court that it is insufficient to sustain the verdict.

5. ——: REFUSAL OF INSTRUCTIONS. The refusal to give requested instructions, proper in form and substance, is not reversible error, when it appears that every material point contained therein is covered by those given by the court on its own motion.

ERROR to the district court for Thurston county: GUY T. GRAVES, JUDGE. *Affirmed.*

*J. J. McCarthy, Fred S. Berry* and *M. F. Harrington*, for plaintiff in error.

*Grant G. Martin, Attorney General, George W. Ayres, Frank E. Edgerton, C. A. Kingsbury, Howard Saxton* and *C. H. Hendrickson, contra.*

FAWCETT, J.

On June 30, 1910, Louise Flege was shot and killed at her home in Dixon county. Plaintiff in error, who will be designated herein as defendant, was charged with her murder. He was first tried in the district court for Dixon county and found guilty of murder in the second degree. That conviction was reversed and the case remanded for further proceedings. 90 Neb. 390. After the case was remanded to the district court the venue was changed to Thurston county, where upon a second trial defendant was found guilty of manslaughter. Error was again prosecuted to this court, and the judgment of conviction again reversed and the case remanded. 93 Neb. 610. A third trial was had in Thurston county and defendant again found guilty of manslaughter, and the case is now before us for a third review. A statement of some of the important facts and circumstances in the case appear in our two former opinions above cited.

In one particular the record now before us differs from the two preceding ones. This difference is found in the testimony given by the medical experts. One of the grounds on which the second conviction (93 Neb. 610) was reversed was that the jury must have ignored the testimony of the medical experts introduced by the defendant. Reference is made to that opinion for a statement of the substance of their testimony. On the third trial the state met this expert testimony with the testimony of two witnesses, Doctor Dunn and Doctor Waite, both men of high standing in their profession. Professor Haines and Doctor Hektoen, who appeared as witnesses for the defendant both on the second trial and on this, testified that from their examination of the stomach contents. it was their opinion that Louise Flege was not killed until two and one-half or three hours after she had eaten her dinner, which the uncontradicted evidence shows was at or shortly after 12

Flege v. State.

o'clock on the day of the tragedy. Eichtencamp, the witness for the state on whose testimony this conviction largely, depends, testified that she was shot by the defendant at or shortly after 1 o'clock. She was shot twice, once in the breast and once through the head, the shot through the breast being, unquestionably, the first of the two shots. The question then is: Were the shots which Louise received, or either of them, instantly fatal, and, if instantly fatal, may there have been post-mortem digestion? On both of these points there is now a direct conflict in the testimony of the medical experts. Doctor Dunn and Doctor Waite, and particularly Doctor Waite, testified that digestion in the case of Louise might have continued for an hour or more after death. The stomach contents showed that in some manner or other a considerable quantity of blood had been taken into the stomach, so that at the time the stomach was removed by Doctor Meis its total contents weighed six and one-half ounces, of which two ounces were blood. The evidence is clear that on the day in question Louise was in a perfectly healthy state. It must be presumed, therefore, that her stomach was normal. The secretion of gastric juices in the stomach begins, in most cases, in from five to eight minutes after eating, and in some cases immediately thereafter. The secretions necessary to cause digestion are hydrochloric acid and pepsin. In a person like Louise, who, under any theory of the case, lived for at least an hour after eating her midday meal, there would be the normal amount of secretion of gastric juices. The theory of the doctors for the state is that in a case of that kind, where a person in perfect health is instantly killed about an hour after eating, the hydrochloric acid and pepsin will continue to perform their digestive functions until they have been consumed. Professor Haines for the defense testified that the stomach contents, as examined by him, did not show the presence of any free hydrochloric acid. Doctor Waite testified that under the conditions indicated digestion might continue for a week or more after a healthy person's death, although during that period it might be very much retarded. We think it

is clear from the evidence that the wound in the breast was not necessarily instantly fatal. The evidence as to the wound in the head shows that the bullet entered about two and one-half or three inches behind and on a level with the opening of the left ear, and came out through the left cheek about an inch below the eye. Professor Haines testi-fied that he was not an expert on such matters, and de-clined to give an opinion as to whether or not the shot was instantly fatal. Doctor Hektoen and two or three other witnesses for the defense testified that that shot was instantly fatal, and Doctor Hektoen testified that after death there would be no digestion in either the stomach or the stomach wall. Doctors Dunn and Waite for the state testified that you could not tell from the mere fact that the bullet entered and came out at the points indi-cated that the shot was instantly fatal; that the bullet may have been deflected; that in penetrating the skull it may have been deflected and passed around on the inside of the skull, missing the vital parts, and then have come out through the cheek; that the fact that you could pass a probe straight through from the point of entrance to the point of exit does not prove that the bullet went straight, for the reason that, on account of the softness of the brain tissue, a probe could be passed right through the brain. The question, therefore, on this point is, not necessarily when Louise was shot, but when she died. If the shot through the head was instantly fatal, Eichtencamp's story was probably false; while if it was not instantly fatal, so that she may have lain there in an unconscious condition for a period of an hour or more before she died, his story could be true. Whether it was true or false was a ques-tion for the jury.

We shall not attempt an elaborate review of the testi-mony of the various witnesses, but will refer to enough to show that counsel for defendant were mistaken when they said in their argument at the bar that the conviction in this case rests entirely upon the uncorroborated testimony of Eichtencamp. Herbert Henrichs testified that on the Friday prior to the tragedy he and defendant were talking

about Louise, and that defendant said "he would get hell
again in the morning from Louise, and he thought he was
his own boss, she didn't have no business scolding him all
the time, and he soon would be done with her." He fur-
ther testified to a conversation with defendant on August
15, 1910, which was about a month after Eichtencamp had
charged defendant with the crime; that defendant asked
him in that conversation who he thought "done that;"
that witness said to him, "Albert couldn't tell such a story
about him doing it if it wasn't true;" and that defendant
said, "That didn't make any difference, he had a better at-
torney than Kingsbury, and he'd get out of that all right,
and if Kingsbury got another one he would get still a bet-
ter one." A. H. Maskell testified to having a conversation
with defendant subsequent to the tragedy and after de-
fendant had been charged with the crime, in which he
asked defendant why he had bought his revolver; that de-
fendant in answer said he did not know why, that he just
wanted a revolver; and that he said, "If I didn't have this
revolver I would not had this trouble." The record shows
that defendant and his brother Fred returned from Dixon
to the home of the latter about 4 o'clock that afternoon, and
that defendant left there about half an hour later, as Fred
supposed, for his home. He was driving his car, in which
he could have reached his home, about a mile and a half
away, in from five to ten minutes. Instead of going di-
rectly home, he stopped at the Henrichs place, visited a
while with the Henrichs girls, and then went out into the
field, as he says, to invite the Henrichs boys to a beer
party which was to be given at Fred's home that evening by
Fred's hired man. He remained in the field for an hour
or more. Between 6 and 7 o'clock Eichtencamp telephoned
to Fred's residence and inquired for defendant. Fred
seemed surprised that defendant had not reached home.
Eichtencamp told Fred that he had better come over; that
Louise was lying in the yard, and was "pretty nearly all
in." Fred telephoned the Henrichs place and requested
them to tell the defendant to go home. Fred then ran
across the field to defendant's place. When he arrived he

found Louise lying in the yard, dead. Within about a minute after Fred arrived, defendant appeared. Fred testified that when the defendant came up he said to him, "Well, now we got it; if you had stayed home a little better probably this would not have happened." He also testified that he asked him where his revolver was. As these two brothers stood by the side of their dead sister, who had been foully murdered, Eichtencamp, the only man, so far as they knew, who had been on the farm that afternoon, stood about 50 feet away; yet neither of them asked him a question as to when he had first discovered the body, or whether he had seen any one around that afternoon, or had heard the shooting. This is sought to be explained by counsel by saying that the defendant is a man who is dull of comprehension and does not think quickly. No such contention is made, however, for Fred. We have no doubt that the testimony of defendant himself and of his brother Fred, with regard to this incident, was regarded by the jury as strong corroboration of the story told by Eichtencamp at the trial. Reference was made in one of our former opinions to the weeds that were cut in the garden on the day of the tragedy. It is argued here that the testimony shows that those weeds must have been cut in the afternoon of that day, and that, if so, they were cut by Louise after defendant had left home for Dixon, and that this disproves the testimony of Eichtencamp. The witnesses who testified upon this point are the witnesses Lessman and Sohren. On cross-examination neither of these witnesses would say that those weeds might not have been cut in the forenoon, or as early as 9:30 o'clock. This testimony, therefore, does not contradict the testimony of Eichtencamp as to the time Louise was shot. Reference was also made in a former opinion to the testimony of two witnesses as to hearing a shot about 3 o'clock in the afternoon. Jacob Koth testified that he heard a shot at the Flege place about 3 o'clock that afternoon. He testified to but one shot. Two were fired, unquestionably close together. Why did he not hear both shots? Alice Mau is the other of the two witnesses. She testified that about

3 o'clock that afternoon, while she was at the mail box, she heard a sound similar to a loud pounding or the report of a gun. She heard but the one report. Henry Henrichs testified that between 3 and 4 o'clock that afternoon he was fixing a 14-horse power gasoline engine, and that after fixing it he started it up, and he described the explosion made by the engine when it started. He testified further that the Mau mail box was closer to his place than to the defendant's; that the mail box is north of his place, and defendant's place is southeast of his. "Q. Then your place would be between the defendant's place and the mail box where the Mau girl went to get her mail? A. Yes, sir." It is said in the brief of counsel for defendant that, "whenever the necessity or importance of developing new evidence becomes apparent to counsel for the state, they never have to or at least never do, go outside of the Henrichs family." The jury saw the members of "the Henrichs family" on the witness-stand, and evidently did not form the same opinion as to the character of their testimony as that formed by counsel for defendant. It also appears that after the defendant was told that Eichtencamp had charged him with the commission of the crime, and on the same day, he was taken by the officers in an automobile to Ponca; that on that trip he rode in the same seat with Eichtencamp without uttering a word of reproach to Eichtencamp for having, as he now claims, charged him with so foul a crime. A number of other instances are testified to by the witnesses, which we will not burden this opinion by repeating, but will simply say that there were other circumstances detailed, some of them apparently trivial in their nature, but which, taken together with those we have referred to, were sufficient to negative the contention that Eichtencamp's testimony is without corroboration.

The fact that Eichtencamp's testimony at the coroner's inquest, in the early morning after the tragedy, was such that defendant could not be guilty, and that he then sought to bolster up his testimony by testifying to other circum-

stances that were not true, does not necessarily show that he did not testify to the truth at the trial. He explains his former testimony now by saying that, as defendant drove away after shooting Louise, he warned him that if he told anybody what he had seen he would get the same as Louise, and that he was afraid that defendant would do as he had threatened. He was then a boy in his teens, and if he had seen the defendant ruthlessly shoot down his own sister, without, so far as he knew, any cause for so doing, he might well fear that such a man would not hesitate to execute his threat if he failed to heed the warning given. Of this fact the jury were in a better position to be the judges than we are.

In the present consideration of the case, we are confronted with the rule: "If a case has been tried three times, the verdict each time being in favor of plaintiff, this court will not set aside the last verdict as being against the weight of the evidence, unless the evidence is clearly insufficient to support the verdict." *Souchek v. Karr*, 83 Neb. 649, and cases therein cited. It is true that was not a felony case, but the rule seems to be the same, whether it be a civil action or a criminal prosecution.

In 2 R. C. L. p. 199, sec. 169, it is said: "Where a verdict is a second or succeeding verdict and is in accordance with the prior verdicts, the reviewing courts are less inclined to set it aside than if it were a first verdict. Still a verdict controlled by no reason, supported by no justice, and which is manifestly the result of passion and prejudice, will not be sustained on appeal, no matter how many similar verdicts may have been previously returned in the case. This rule is not confined in its operation to civil cases, though it is more frequently so applied, but it is equally applicable in a criminal case."

The author cites in support of his text *State v. Cross*, 12 Ia. 66, wherein, at page 68, it is said: "It will be observed that the defendant objects to a second verdict finding him guilty of the same offense. It is true that the first was set aside, because the court was satisfied that it was not the free and unbiased conclusion of *one* of the

jurors. And, giving to the defendant all benefit resulting from this fact, it still appears that at least 23 jurors, under their solemn oaths, have found him guilty of this offense. This consideration has much weight with us in sustaining the ruling below."

In the light of the rule as above announced, which we think is sound, unless we can say that the evidence "is clearly insufficient to support the verdict," it is our duty to sustain it. In reviewing a first conviction, we might be justified in giving the accused the benefit of any doubt existing in our minds, and grant him a new trial; but, after three different juries have found him guilty of the crime charged, it would be an unwarranted invasion of the province of the jury to set aside the third conviction, unless well satisfied that the defendant has not had a fair trial, and that the evidence was clearly insufficient to show his guilt.

We come now to a consideration of the assignments of error occurring at the trial. Does the same rule apply here, viz.: Should a third conviction for the same offense be set aside for errors occurring at the trial, unless it clearly appears that those errors deprived the accused of a fair trial and were the probable cause of his conviction? We must answer that question in the negative. We have gone through this record with great care, and, while the trial court made some rulings on the admission and exclusion of evidence that we would not have made had we been trying the case, we do not think they are of such gravity as to call for a reversal. We are unable to discover any error in the instructions given by the court. Instruction No. 12, defining motive, is assailed, and it is urged that this instruction was declared erroneous in our first opinion, 90 Neb. 390. The first paragraph of the instruction as given at this trial comprises the whole of the instruction given at the former trial. As so given it was condemned; but on this trial the court added what it considered would meet the criticism of the instruction in our former opinion. We think the addition made by the court is sufficient to relieve it from our former criticism, and,

as given at the last trial, it did not constitute reversible error. The case then resolves itself down to one point, whether the court erred to such an extent as to demand a reversal because of the instructions which defendant requested and which were refused. The court's charge to the jury contained 28 separate paragraphs. The assignments of error discussed in defendant's brief cover 14 instructions requested by defendant and refused by the court. It would unnecessarily lengthen this opinion to refer to these instructions in detail. We deem it sufficient to say that every material point tendered by them is covered by the charge given by the court on its own motion.

Thirty-six jurors, twelve of them residents of defendant's own county, where he has lived substantially all his life, after having seen Eichtencamp and the defendant and the other witnesses upon the witness-stand and heard them give their testimony, have said by their verdict that they believe Eichtencamp is now telling the truth. The trial judge has sustained them in so finding. As an appellate court we must sustain the conviction, unless we can conscientiously say that we are satisfied that the jury were actuated by passion or prejudice, or that they were not warranted in giving credit to the testimony of Eichtencamp and discrediting that of the defendant. This we cannot say.

Finding no error in the record which would justify setting aside this, a third conviction, the judgment is

AFFIRMED.

HAMER, J., not sitting.

SEDGWICK, J., dissenting.

I think that the majority opinion gives altogether too much consideration to the fact that there have been three jury trials and three verdicts against the defendant. It is said that the rule to be enforced is: "If a case has been tried three times, the verdict each time being in favor of plaintiff, this court will not set aside the last verdict as being against the weight of the evidence, unless the evidence is clearly insufficient to support the verdict."

*Souchek v. Karr,* 83 Neb. 649.   But the settled rule of
this court is that a verdict will not be set aside because
of insufficiency of the evidence in any case, unless "the
evidence is clearly insufficient to support the verdict."
This pronouncement, then, in the *Karr* case is nothing
more than a declaration that the court will consider the
fact that former verdicts have been found against the
defendant.   How much consideration should be given to
that fact depends upon circumstances connected with the
former conviction.   In the citation from 2 R. C. L. p. 199,
sec. 169, the author is speaking of directed verdicts and
cases where former verdicts have been set aside for in-
sufficiency of the evidence.   If the court has declared that
the whole evidence, fairly considered, is insufficient to sus-
tain a verdict of guilt, and again a second verdict, and a
jury finds a third verdict of guilt upon the same evidence,
the court would seriously consider whether to affirm the
third conviction or dismiss the case, and that would, under
the decision in *Souchek v. Karr, supra,* depend upon
whether the verdict was clearly wrong.   If, on the other
hand, the former verdicts were set aside for errors in
submitting the case so that the merits of the case had not
been passed upon by the jury, if the verdict of guilt in the
former trials was caused by erroneous instructions, it
could not be considered that the jury had passed upon
the sufficiency of evidence.   It was the instructions of the
court that caused the former verdicts, as though the court
had instructed the jury to return such verdicts.   In the
Iowa case cited, *State v. Cross,* 12 Ia. 66, the former ver-
dict had been set aside because one of the jurors had not
clearly consented to a verdict of guilty.   The case was
properly submitted, and eleven jurors had found the evi-
dence sufficient.   The court gave some consideration to
the fact that 23 jurors had passed upon the sufficiency of
the evidence.   We give much consideration to the fact that
one jury has done so, and will not set aside their verdict
unless clearly wrong.   This court has said that the first
two attempts were mistrials.   If this defendant has now
had a fair trial, that is, if the evidence has all been fairly

submitted to the jury, the question for the first time is whether that evidence proves the defendant's guilt beyond a reasonable doubt.

There is no direct evidence of the defendant's guilt, and no proof of any tangible fact that necessarily points to his guilt, except the evidence of the witness Eichtencamp. Flege is the defendant, and of course his interest in the case is such that his evidence must be carefully scrutinized. When it became evident that either Eichtencamp or Flege committed this crime, and Eichtencamp was informed that that was the conclusion of the prosecuting officers, it became at once a contest between Eichtencamp and Flege, so that Eichtencamp's evidence is also to be considered in view of that fact. When a great crime is committed that becomes notorious and shocks the whole community, it is natural for people, especially those who have had no experience in weighing evidence, to entertain belief as to who is guilty. When an ordinary individual gets the belief in his mind that a certain one is guilty, then his imagination will help out, and anything that appears tends to confirm that belief, and so in this case, in proving indications of Flege's guilt derived from his conduct, we have the state proving by its witnesses that he did not cry, and those who are inclined to believe him guilty rather than Eichtencamp consider it some evidence of his guilt. The state by other witnesses proved that his eyes were red and his face swollen. That circumstance was perhaps inconsistent with the other, but was also evidence of guilt to those who observed that fact. I do not find in any of these statements in regard to what Flege did and how he acted any evidence whatever that tends to corroborate Eichtencamp. There is no man that can tell how he himself would look and exactly how he would act if he should go to his back yard and find a member of his own family horribly murdered. There are no two men who would act exactly alike under such circumstances, and we cannot tell from the fact that defendant did or did not cry, or that his eyes were red, anything about his probable guilt. In order to support the verdict we must believe Eichtencamp.

He is a perjured witness, self-confessed, and with the same interest as though he himself were on trial for this crime. It is more than probable that either Eichtencamp or this defendant committed this crime. Two witnesses testified that they heard a pistol shot at the Flege place at about 3 o'clock. If that is true, the defendant is probably not the guilty party. The defendant was not in that vicinity after about 1 o'clock that day. Of course, these witnesses may be mistaken. Several of the witnesses testified that they were within hearing distance and did not hear any pistol shot at about 1 o'clock, the time that Flege left. That evidence is not very important, because they might not have heard it, but it is to be considered. Eichtenkamp told many persons soon after the murder that after Flege had gone he went to the house and found Louise there. He swore to that upon the first investigation. There is no doubt about that. That he did so state and did so swear is proved by unimpeachable evidence. If he told the truth then, rather than upon the final trial, when he had an interest in testifying as he did, Flege is not guilty, since Louise was alive after Flege left. Dr. Haines, whom we all know to be absolutely competent and unprejudiced, testifies that, under the circumstances from his investigation of the contents of the stomach, he knows that Louise was not killed before 2 o'clock, and probably not until 3. He is supported by another witness who is unprejudiced. If this testimony is true, Flege is not guilty. They attempt to meet this testimony in several ways. They put on several experts, who were apparently competent, to testify that when a person is killed, if there is a supply of gastric juice in the stomach, digestion will proceed until that supply is exhausted. They do not pretend that the stomach will keep on supplying this gastric juice after death. There is some other testimony upon that line that it is not necessary to mention. These experts seem to conclude that it is possible (barely possible) that Louise may have been shot as early as 1 o'clock. The evidence does not prove beyond a reasonable doubt that she was shot as early as 1 o'clock, and, if she was not, Flege is not guilty.

To further strengthen this evidence, one witness testifies that a bullet fired through the head as this one was might not produce instant death. His reason is that it might be deflected, and so pass around the brain, but certainly these doctors know whether the bullet went through the skull and came out through the skull. As it did go through the skull, what could it strike that would deflect it? The witness says that passing a probe through the course of the bullet would not prove that the bullet went directly through, because the probe would pass through the soft brain tissues; but I should think that the bullet would too, unless the brain was hard enough to deflect it, which is not probable. A circumstance which they prove and which they seem to think indicates Flege's guilt is that he was slow about getting home after he and his brother had been to town. This they say indicates that he was dreading to meet the facts of Louise's death; but to a man who wanted to find Flege innocent it might just as well mean that he had not known that any harm had come to Louise, or that there was any necessity, now that he had spent the most of the afternoon, of hurrying home. This conviction seems to be sustained upon the theory that, when a case has been tried three times to a jury and the defendant is found guilty every time, the court will not set aside a verdict, unless it is clearly wrong; but that is true in any case, and the rule has no application except in those jurisdictions where the court has refused to set aside the verdicts of juries, even if they are clearly wrong. If the verdict is clearly wrong, and Flege is not guilty of this murder, a hundred irregular and illegal trials will not make him guilty. It is possible that Flege may be guilty. Somebody is guilty, without doubt; but the fact that they cannot prove with certainty that some one else is guilty is not a sufficient reason for convicting Flege. There are circumstances clearly proved which tend to corroborate the defendant's testimony, and none of importance which corroborate the story which Eichtencamp now tells. There is no reason for believing Eichtencamp rather

than the defendant, and therefore the defendant is not proved guilty beyond a reasonable doubt.

BARNES, J., concurs in the above dissent.