JOSEPH WITTY V. STATE OF NEBRASKA.

FILED DECEMBER 23, 1920.     No. 21585.

1. Criminal Law: EVIDENCE: VOLUNTARY STATEMENTS. Voluntary statements against interest, made by a defendant in a criminal case at or about the time of the alleged commission of the crime with which he is charged, are admissible in evidence against the accused.

2. ———: ———: ———: INSTRUCTION. Where a witness in a criminal case testified to an alleged voluntary declaration against interest, made by the defendant at or about the time of the alleged commission of the crime with which he is charged, and it does not appear that such declaration was induced by the fear of punishment or the hope of reward, it is not error for the court to refuse to give a tendered instruction which emphasizes in its charge to the jury that evidence of "all verbal admissions, declarations or conversations," made by the accused, "should always be received with great caution."

3. Rape: EVIDENCE. "While in a prosecution for rape, or an assault with intent to commit rape, the state may only inquire of the prosecutrix whether she made complaint of the injury, and when and to whom, but not as to the particular facts which she stated, still the defense, in cross-examination, may inquire as to such particular facts." Wood v. State, 46 Neb. 58.

4. ———: ———: CONSENT. "In a prosecution for an assault upon a girl under the statutory age of consent, with intent to commit a rape, whether the girl consented or resisted is immaterial, and to constitute the offense it is, therefore, unnecessary to prove that the defendant intended to use force if necessary, to overcome her resistance." Wood v. State, 46 Neb. 58.

ERROR to the district court for Douglas county: ALEXANDER C. TROUP, JUDGE. Affirmed.

*John M. Berger* and *Albert S. Ritchie,* for plaintiff in error.

*Clarence A. Davis, Attorney General, J. B. Barnes* and *C. L. Dort, contra.*

DEAN, J.

Joseph Witty was indicted by the grand jury in Douglas county and charged with having committed rape, July 8, 1919, upon the person of a thirteen-year old female child. At the first trial the jury disagreed. At the next trial he was convicted and sentenced to serve a term of ten years in the penitentiary. He prosecutes error.

Owing to the numerous assignments of alleged error in the record, the necessity has been laid upon us of reproducing and discussing more of the evidence than is usual and more than would otherwise have been necessary. But for this fact much of it might well have been omitted.

The father of Mildred, that being the name of the prosecutrix, died when she was about eight. From that time until she was twelve, she and a brother, three years her junior, lived at an Omaha crèche, her mother being employed at a bakery. For about a year prior to July 8, 1919, she lived in a home occupied by her mother, her little sister, her grandmother and an uncle and aunt. Mildred was living with them when, on Wednesday July 2, 1919, she was taken by her aunt to the Witty home in answer to an advertisement by Mrs. Witty that she wanted a little girl between the age of twelve and fourteen to help with the housework and to assist in the care of an infant child about two years old. Mrs. Witty was then about five months advanced in pregnancy. For her services Mildred was to be clothed, boarded and lodged. There was some talk about the Wittys adopting her. The house had three rooms. Mildred slept in the front room on a couch. The Witty family slept in the middle room, adjoining the front room, a kitchen being in the rear. After she retired on Saturday evening, that being her fourth day at the Witty home, she testified that the defendant came into the

room at about 9 o'clock, clad only in his undergarments, and made improper proposals to her; that he there told her about a little neighbor girl of thirteen and said, "'Alice never does tell her mother and father,' and I says, 'That is no sign I won't tell my mother;'" that she kicked at him and told him to go away; that he finally went away, but after she had fallen asleep he came again and putting his hands on her person awakened her; that again she resented his advances and again he went away and did not disturb her for two or three nights; that on Tuesday night following, namely, July 8, 1919, he again came into her room after she had retired. Concerning his conduct that night she testified: "Then he kicks me into the other room. Q. How did he kick you? A. Hitting me on the back and everything. Q. What did he hit you with? A. His knee. Q. What happened then? A. He pushes me on the bed. * * * Q. What did you say to Mr. Witty, if anything, when he pulled you out of your room into his? A. He said not to say anything or 'I will slap you with the razor strap.' Q. Did you say anything while he was doing this thing to you? A. I screamed and says, 'Quit that.' Q. What did he say if anything? A. He just laughed. Q. Did Mrs. Witty say anything at that time? A No, sir. Q. Did she say anything later? A. Yes, sir." The witness then testified that Mrs. Witty said to her, in substance, that she must submit. She further testified that she protested and tried to get away from him, but that he succeeded finally in accomplishing his evil purpose. She said that Mrs. Witty at the time threatened that she would whip her with a razor strap if she refused to submit to Witty's demands and that she was afraid of her. The next morning she went with her grandfather and another man to the police station and later the same day to her grandmother's home. She testified, over defendant's objection, that in the afternoon or evening she complained to her grandmother and told her about what Witty had done on the previous Tuesday night.

Mrs. Elizabeth Kent is Mildred's grandmother. She testified that she talked with Mrs. Witty on July 1, in

answer to her advertisement, and that subsequently Mr. Witty called her up and said, "What do you think about me adopting the little girl?" to which she replied that she thought it was rather early to talk of adoption. She further testified that Mildred told her in the afternoon of July 9 about Witty's conduct toward her the night before. Delbert Weaver is an employee of the smelting company at Omaha where defendant was employed. He testified that, in July, shortly before his arrest, Witty told him "about a certain girl that he was familiar with," and told him that he had sexual intercourse with her. Edward Bryant is employed by the same company. He testified that some time before the commission of the alleged offense he heard defendant talk about a little girl with whom he said he tried to have sexual intercourse, but that when she screamed he desisted; that the next day he said: "I am going home earlier and I am going to try it over." Clark Kent, Mildred's uncle, testified that defendant told him when he was at the Witty home on July 4, 1919, that he wanted to adopt Mildred; that Mrs. Witty was present part of the time, but said nothing about adoption; that Witty, in speaking about Mildred crying a day or two before, said to him: "He said he came home and found her crying and he kind of consoled her and loved her up, that is the way he quieted her by putting his arms around her and loving her in that way." Doctor Marcia Young, an examiner for the juvenile court, subjected Mildred to a physical examination in her office July 10, 1919, and testified that in her opinion Mildred's physical condition indicated recent sexual intercourse.

The defendant denied in detail all of the material and damaging evidence of the state's witnesses. He not only denied calling up or talking to Mildred's grandmother about adopting Mildred, but in referring to Clark Kent's evidence he said that Mr. Kent told him he had trouble with the girl, and that if she would not consent that defendant adopt her "he would send her to the reform school;" that Mildred overheard her uncle's statement and when he

went away she began to cry and said: "If you adopt me I will run away and tell lies on you and cause you trouble." In his cross-examination defendant testified: "Q. Isn't it a fact that Mildred's nightgown was retained out at your house? A. There was a nightgown left there, if somebody didn't get it; they didn't know who it belonged to. Q. How do you know they didn't know who it belonged to? A. I didn't know; I was locked up; I, was in jail. Q. The fact of the matter is it is still there? I wouldn't know; my wife wouldn't; that is immaterial to me any way." On the cross-examination defendant denied too that he had told Mildred that Alice did not object to having her dress raised or that she did not object to his familiarities. He denied that he had said to Mildred that Alice did not tell her parents about his conduct. He emphatically denied that he ever attempted to take liberties with Alice.

Mrs. Witty testified. It developed in her testimony that she had been indicted by the same grand jury that indicted her husband, and that she was charged with aiding and abetting him in the commission of the crime for which he was tried. Elsewhere in the record it appears that a *nolle prosequi* was entered and that the case as to her was dismissed. She corroborated substantially all of the material evidence introduced on the part of her husband. She testified that on the night of July 8 she called Mildred into the house from the front yard and told her to go to bed; that she then went into her bedroom; that her husband was then in bed; and she slept in the front of the bed and he slept next to the wall, as had been his custom for four years; that Mildred was not in their room that night nor did her husband get out of bed after he retired until the usual time the next morning. She denied in detail all of Mildred's evidence respecting the occurrences that Mildred said took place on the night of July 8; that she, and not her husband, called up Mildred's grandmother and told her that she would like to adopt her; she corroborated her husband's testimony in regard to his talk with Clark Kent about Mildred's adoption; that in speaking of the

Witty home Mildred had said to her: "She didn't like the place, and if we adopted her she would run away and tell lies on us." In regard to the removal of Mildred's clothes she testified on the cross-examination: "A. They asked my husband for the clothes, and I wasn't at home that day and my uncle came and got them. Q. Did you pack them for her? A. No; he got them himself. Q. Your uncle did? A. Yes." The testimony of the matron of the crèche reflected upon Mildred's conduct while she was under her control. Her testimony, even if true, does not bear on the issues. Mildred, however, denied all of her accusations. Two physicians testified on the part of defendant to the effect that Mildred's condition as disclosed by Doctor Marcia Young's evidence might have been produced by some other cause than sexual intercourse. Under the circumstances here we do not think their evidence is relevant to the issue. Alice was recalled in rebuttal to explain former testimony. She testified: "Q. This morning you testified that Mr. Witty had done something bad to you, and you told Mr. Ritchie, in answer to his question, that you had told that at the last trial. Now, did you mean you had told it in this room at the last trial, or out here in the hall to some officer? A. I didn't tell it in the last trial. Q. Where did you tell it, Alice? A. To Mrs. Hopkins. Q. That is the juvenile officer? A. Yes, sir." On the cross-examination she testified that Mr. Witty raised her dress and that Mildred was in the front room and did not see him do so. When the rebuttal testimony of Alice was concluded defendant's counsel asked leave to recall him, which was denied. He then offered to show by defendant that he never raised Alice's dress and never made any indecent proposals to her. The offer was denied, and error is alleged. Error cannot be predicated on the court's ruling on this point because defendant had already testified before Alice was called to the stand that he had not committed either offense as against her. He cannot maintain that he was denied a substantial right or that he was prejudiced merely

because he was not permitted to submit the same denial two times to the same jury.

Counsel argues that the court erred in permitting Mrs. Kent, the grandmother, to testify that Mildred made complaint to her in the afternoon or evening of July 9 that defendant had sexual intercourse with her the night before. In his brief he says that the complaint was not one "arising spontaneously out of the transaction. Here it was only at best a relation of a past event, too remote from the time. It was inadmissible altogether." We think the testimony of Mrs. Kent comes within the rule. The complaint was made, recently after the alleged commission of the outrage, to one of the persons to whom she would naturally go for that purpose. Evidently it was the first opportunity that she had to make complaint to one of her own sex of the abhorrent humiliation to which it is charged that she had been subjected. *Wood v. State,* 46 Neb. 58.

The defendant argues that the court erred in giving instruction numbered 1 because in part it is in the language of the indictment. We do not think the court erred. The instruction has the merit of brevity and is to the point. It has no tiresome repetitions and is easily understood. It is elementary that instructions should be applicable to the issue that is being tried. They were so in the present case. *Flege v. State,* 90 Neb. 390.

It is argued "that it cannot be seriously claimed that the intercourse was a rape by force," and an instruction is criticised wherein the jury is informed that, "Whether she was previously chaste and whether she consented or resisted is entirely immaterial." The prosecutrix was under the statutory age of consent. It follows that it was immaterial whether she consented or resisted. *Wood v. State,* 46 Neb. 58. The law relating to the complaint respecting when and to whom made by the prosecutrix, and that pertaining to the age of consent, resistance, and the like, is fully discussed by Judge Irvine in the *Wood* case.

Defendant argues that the court erred in refusing to give a tendered instruction that cautioned the jury with

respect to its consideration of the testimony of the witnesses Weaver and Bryant who testified to alleged statements made to them by the defendant against interest. We do not think the court erred in its refusal. The statements were alleged to have been made to fellow employees and appear to have been entirely voluntary and somewhat boastful. It does not appear that the declarations were induced by the fear of punishment or the hope of reward. It is elementary that voluntary statements so made by the accused at or about the time of the alleged commission of a crime are admissible in evidence against him the same as other competent evidence. Where a witness in a criminal case testifies to an alleged voluntary declaration against interest, made by the defendant at or about the time of the alleged commission of the crime with which he is charged, and it does not appear that such declaration was induced by the fear of punishment or the hope of reward, it is not error for the court to refuse to give a tendered instruction which emphasizes in its charge to the jury that evidence of "all verbal admissions, declarations or conversations," made by the accused, "should always be received with great caution."

With respect to alleged error in the giving and refusing of instructions generally, and with respect to the admission and exclusion of evidence over counsel's objection, we are unable to discover that the substantial rights of the defendant were prejudiced. The evidence conflicts, but it was submitted to the jury and appears to be amply sufficient to support the verdict. We do not find reversible error. The judgment is therefore

AFFIRMED.